T.C. Memo. 2000-137

UNITED STATES TAX COURT

ALTON F. EMERSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6276-99.                    Filed April 12, 2000.

Alton F. Emerson, pro se.

<u>Felicia L. Branch</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  Respondent determined deficiencies in and accuracy-related penalties on petitioner's Federal income taxes as follows:

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|----------------------------------------|
| 1992 | $11,579 | -- |
| 1995 | 32,499 | $5,750 |
| 1996 | 29,522 | 5,314 |

The issues for decision are:[1]  (1) Whether petitioner's automobile drag racing activity was engaged in with the intent to make a profit.  We hold it was not.  (2) Whether long-term disability payments received by petitioner in taxable years 1995 and 1996 are includable in gross income.  We hold they are.  (3) Whether individual retirement account (IRA) distributions received by petitioner in taxable years 1995 and 1996, as well as pension and annuity distributions received by petitioner in taxable year 1996, are includable in gross income.  We hold they are.  (4) Whether petitioner is liable for the 10-percent additional tax under section 72(t)[2] on IRA distributions totaling $37,500 and $29,500 in taxable years 1995 and 1996, respectively. We hold he is.  (5) Whether petitioner is liable for an accuracy-related penalty pursuant to section 6662(a) for taxable years 1995 and 1996.  We hold he is.

---

[1]The notice of deficiency contains adjustments to itemized deductions for taxable years 1995 and 1996 and disallows a net operating loss carryback to 1992 related to the operations of petitioner's automobile drag racing activity in 1995.  These are computational adjustments which will be affected by the outcome of the issues to be decided, and we do not separately address them.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time the petition herein was filed, petitioner resided in Orlando, Florida.

Petitioner timely filed his Federal income tax returns in 1992, 1995, and 1996. In 1995, petitioner reported on his Federal income tax return that he received $49,218.81 as nontaxable sick pay and $89,100 as nontaxable IRA distributions. Respondent determined that $51,600 of the IRA distributions were attributable to petitioner's disability. On Schedule C, Profit and Loss From Business, of his 1995 tax return, petitioner reported deductions of $70,428.52 from his automobile drag racing activity named Emerson Racing Enterprises. Petitioner reported no income from this activity, resulting in a $70,428.52 loss. Related to this loss in 1995, petitioner carried back a $63,095 net operating loss deduction to taxable year 1992, which resulted in a refund to petitioner of $11,579. At the end of 1995, petitioner was age 57.

In 1996, petitioner reported nontaxable income of $50,628 as sick pay, $29,500 in total IRA distributions, and $39,506 in total pensions and annuities. Respondent determined that the $39,506 in total pensions and annuities was attributable to petitioner's disability. Petitioner reported zero income or loss from the automobile drag racing activity in 1996. On his 1996

return, petitioner stated:

> This [automobile drag racing] activity, [sic] still in existence, is operating at a loss, but since there were no winnings, all expenses are being absorbed as if they were "hobby losses" and, as such, have no effect on Adjusted Gross Income. (Schedule 1).

At the end of 1996, petitioner was age 58.

The sick pay petitioner received was from a long-term disability insurance policy. Petitioner's former employer, ECC International, paid the premiums on the long-term disability policy. Petitioner retired from ECC International after experiencing medical problems.

During the years in issue, petitioner engaged in an automobile drag racing activity named Emerson Enterprise Racing. The only asset of Emerson Enterprise Racing was a race car purchased by petitioner in 1994. Petitioner located his race car, a two-door batwing 1959 Chevy El Camino, by placing an advertisement in an Orlando, Florida, newspaper. The previous owner of the car was a farmer who had stored the car in a barn. When petitioner went to look at the car in the farmer's barn, it could barely run, but he decided to purchase it. By spending over $100,000 during the years he engaged in this activity, petitioner revamped the car into a bright red dragster that could legally be driven on streets as well as for racing. The car was

featured on the front cover of two magazines in 1997, Hot Street Cars and Bracket Racing USA.

Petitioner raced automobiles when he was younger, but he had to discontinue the activity because it was too costly. Between 1992 and 1997, petitioner lost over $150,000 on the automobile drag racing activity in this case. Petitioner did receive a small number of cash prize awards in the hundreds of dollars from the activity. However, except for reporting $200 of winnings in 1994, petitioner never reported any income from this activity on his tax returns. Petitioner maintained no written records related to races or how he had placed in any races. Petitioner did not maintain a separate checking account for this activity.

Petitioner had no business plan for his automobile drag racing activity and made no forecasts of income or expenses. Although he tried to find one, petitioner had no sponsor or other financial backers to finance his activity.

Petitioner stopped the racing activity in 1997 or 1998. Since his departure from racing, petitioner has tried to sell his race car. Although petitioner has over $100,000 invested in the race car, the highest offer he has received for the car is $20,000, which he rejected.

Petitioner devoted about 40 hours per week to the automobile drag racing activity, which included working on the race car and racing the car two to three nights a week at a race track.

Petitioner employed a mechanic on a contract labor basis to do some of the work on the race car. During 1995 and 1996, petitioner was retired/disabled and did not have any other employment.

Petitioner's source of advice for the activity was industry publications that provided ways of improving his race car to make it more competitive. In addition, petitioner received advice regarding improving his car from other drivers who had faster race cars.

The only type of business or operating license required for racing was a drag strip license (NHRA license), which petitioner does have. However, because of petitioner's heart condition, his NHRA license has speed restrictions which limit his ability to drive his race car competitively. Because of the restrictions placed on petitioner's NHRA license and his health condition, to have any chance of winning "the money races", petitioner's son has had to drive petitioner's car.

OPINION

Issue 1.  Whether Petitioner's Automobile Drag Racing Activity Was Engaged in With the Intent To Make a Profit

Section 162(a) allows deductions for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. In the case of an activity not engaged in for profit, section 183 generally limits allowable

deductions attributable to the activity to the extent of gross income generated by the activity.  See sec. 183(b).

The test for determining whether an individual is carrying on an activity for profit is whether the taxpayer's actual and honest objective in engaging in the activity is to make a profit. See Osteen v. Commissioner, 62 F.3d 356, 358 (11th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1993-519; Surloff v. Commissioner, 81 T.C. 210, 233 (1983); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs.  While a taxpayer's expectation of profit need not be reasonable, there must be a good-faith expectation of making a profit.  See Allen v. Commissioner, 72 T.C. 28, 33 (1979); sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors to be considered in determining whether an activity is engaged in for profit.  Those factors include:  (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the

activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.  No single factor controls.  See Osteen v. Commissioner, supra; Brannen v. Commissioner, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); sec. 1.183-2(b), Income Tax Regs.

1.  Manner of Carrying on Activity

The manner in which the taxpayer carries on the activity is one indication of a profit objective.  See sec. 1.183-2(b)(1), Income Tax Regs.  Elements relevant to this factor include whether the taxpayer maintained complete and accurate books and records, whether the activity was conducted in a manner substantially similar to comparable businesses that are profitable, and whether changes were attempted in order to improve profitability.  See Engdahl v. Commissioner, 72 T.C. 659 (1979).

Petitioner maintained no written records.  He had no business plan for his activity, and he made no predictions of income or expenses.

Petitioner had no sponsor for the activity, although he did unsuccessfully attempt to obtain one.  While petitioner hoped to make large amounts of money from this activity, he understood that without the "big money" of a sponsor to buy "big expensive parts", a person "can't win the races."  Without a sponsor,

petitioner had no control over the income from this activity, because, in his own words, "at any given time the [race car] engine could just flip off at the line". In the event such an engine failure occurred, petitioner did not have the financial resources to replace his race car's engine quickly and continue this activity.

We find that petitioner did not operate the activity in a businesslike manner. This factor weighs against petitioner.

2. <u>Expertise of Taxpayer or Advisers</u>

Preparation for the start of an activity through extensive study of its accepted business, economic, and scientific practices, or consultation with those who are experts therein, indicates that a taxpayer has entered into an activity for profit. See sec. 1.183-2(b)(2), Income Tax Regs. Petitioner read car-racing magazines and consulted with mechanics and other racers. However, there is no evidence that the persons with whom petitioner consulted had made a profit in car racing or advised petitioner on how to make one, or that they were other than racing fans or hobbyists. Accordingly, we find this factor does not help petitioner.

3. <u>Time and Effort Expended in Activity</u>

The time and effort expended by the taxpayer in carrying on the activity is an indication of whether a profit objective existed, particularly if there are no substantial personal or

recreational elements associated with the activity. See sec.
1.183-2(b)(3), Income Tax Regs. Petitioner devoted 40 hours a
week to the activity including working on his race car and two to
three nights attending races. At the same time, petitioner found
automobile drag racing extremely enjoyable. In spite of a
serious heart condition, petitioner described competitively
driving the race car as a stressful, exhilarating experience that
he enjoyed repeating. Therefore, on balance, this factor neither
supports nor detracts from petitioner's position.

4. Expectation That Assets May Appreciate

An expectation that assets used in the activity may
appreciate in value may be an indication of a profit objective.
See sec. 1.183-2(b)(4), Income Tax Regs. During his involvement
in the automobile drag racing activity, petitioner spent over
$100,000 on the sole asset of the activity, the race car.
Petitioner thought that he might be able to sell the race car for
$40,000 to $50,000. Therefore, petitioner had no expectation
that the race car would appreciate in value. In fact, the
highest offer petitioner has received for the race car is
$20,000, and he realizes that used race cars "don't bring in
money." Accordingly, this factor weighs against petitioner.

5. Taxpayer's Success in Other Activities

The success of the taxpayer in carrying on other activities
can be some indication of whether the taxpayer had a profit

objective for the activity in question.  See sec. 1.183-2(b)(5),
Income Tax Regs.  If petitioner had engaged in similar activity
profitably in the past, it might indicate that the activity in
question was entered into for profit, even though the activity is
presently unprofitable.  See id.  Petitioner raced automobiles
when he was younger but had to discontinue the activity because
it was too costly.  Accordingly, this factor suggests that
petitioner did not engage in the activity for profit.

    6.  History of Income or Losses From Activity

    A history of income, losses, and occasional profits with
respect to an activity can be indicative of whether a profit
motive exists.  See sec. 1.183-2(b)(6), Income Tax Regs.  The
presence of losses in the formative years of a business is not
inconsistent with an intention to achieve a later profitable
level of operation, bearing in mind, however, that the goal must
be to realize a profit on the entire operation, which presupposes
not only future net earnings but also sufficient net earnings to
recoup losses that have been incurred in the intervening years.
See Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379
F.2d 252 (2d Cir. 1967).

    Petitioner began the automobile drag racing activity in
1992.  During the years he operated the activity, petitioner
received only small cash awards; however, he spent over $150,000
on the activity, generating losses in each year, including the

$70,428.52 loss petitioner reported in 1995. Given petitioner's record of losses, we see no possibility that petitioner could recoup his expenditures. Therefore, we find this factor weighs against petitioner.

7. Amount of Occasional Profits Earned, If Any

The amount and frequency of occasional profits earned from the activity may also be indicative of a profit objective. See sec. 1.183-2(b)(7), Income Tax Regs. Other than occasional small cash awards, about which petitioner was vague and of which he kept no records, petitioner's automobile drag racing activity produced no income.

However, the "opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated." Id. There is no doubt that the automobile drag racing activity was a "highly speculative venture". However, petitioner has not convinced us that he ever had an "opportunity to earn a substantial ultimate profit" from the activity.

The small cash awards petitioner received were minuscule in relation to both the losses he incurred and his total investment in the activity, and without a sponsor, petitioner never had an opportunity to earn a substantial ultimate profit. Accordingly,

this factor suggests that petitioner did not operate his automobile drag racing activity for profit.

8.  Taxpayer's Financial Status

The lack of substantial income from sources other than the activity in question may indicate the existence of a profit objective.  See sec. 1.183-2(b)(8), Income Tax Regs.  The rationale for this rule is that a taxpayer with substantial income unrelated to the activity can more easily afford to operate the activity as a hobby.

In 1995, petitioner received $49,218.01 in disability pay, $51,600 in IRA distributions attributable to his disability, and $37,500 in premature IRA distributions.  At trial, petitioner stated that the automobile racing activity is "almost like gambling."  To support his addiction to this activity, petitioner withdrew $37,500 in IRA distributions prematurely.  In addition, he used part of the money designated for his disability to fund the activity.  Petitioner had substantial income unrelated to the automobile racing activity.  Accordingly, this factor does not favor petitioner.

9.  Elements of Personal Pleasure

The absence of personal pleasure or recreation relating to the activity indicates the presence of a profit objective.  See sec. 1.183-2(b)(9), Income Tax Regs.  There is no question that petitioner enjoyed and obtained pleasure from his automobile drag

racing activity.    Although this factor standing alone does not indicate that petitioner did not engage in this activity for profit, the combination of factors is fatal to petitioner's case.

Although petitioner's testimony was frank and generally credible, it was also vague and unsubstantiated.  He had no records and testified from memory.

On the basis of the record, we find that petitioner did not engage in the automobile drag racing activity for profit. Accordingly, respondent is sustained on this issue, and petitioner is not allowed to deduct Schedule C expenses associated with this activity in 1995.

Issue 2.  Whether Long-Term Disability Payments Received by Petitioner in 1995 and 1996 Are Includable in Gross Income

Section 61(a) provides that gross income means all income from whatever source derived.  Certain income, however, may be specifically exempted from inclusion in gross income.  See sec. 61(b).

Gross income does not include amounts received through accident or health insurance for personal injuries or sickness (other than amounts received by an employee to the extent such amounts are (1) attributable to contributions by the employer which were not includable in the gross income of the employee; or (2) paid for by the employer).  See sec. 104(a)(3).  In Trappey v. Commissioner, 34 T.C. 407, 408 (1960), we held that disability income received through accident or health insurance for personal

injuries or sickness is within the meaning of section 104(a)(3).

Hence, the provisions in sections 104 and 105 dealing with

amounts received through health insurance are used to determine

whether petitioner's disability benefits constitute taxable

income.

> Section 105(a) provides:
>
> Except as otherwise provided in this section, amounts
> received by an employee through accident or health
> insurance for personal injuries or sickness shall be
> included in gross income to the extent such amounts (1)
> are attributable to contributions by the employer which
> were not includible in the gross income of the
> employee, or (2) are paid by the employer.

The parties stipulated that petitioner's former employer, ECC

International, funded the long-term disability plan and paid all

the premiums.  Additionally, petitioner presented no evidence

that the sick pay he received from the long-term disability plan

maintained by his previous employer was excludable from his gross

income.  Therefore, we sustain respondent's determination that

the disability payments received by petitioner are includable in

his gross income pursuant to section 105(a).

Issue 3.  Whether IRA Distributions Received by Petitioner in
Taxable Years 1995 and 1996, as Well as Pension and Annuity
Distributions Received by Petitioner in 1996, Are Includable in
Gross Income

Annuities and pensions are specifically included in gross

income.  See sec. 61(a)(9), (11).  In addition, under section

408(d)(1), a distribution from an IRA is generally included in

the gross income of the distributee in the year of distribution.

In general, section 72 deals with the tax treatment of distributions from pensions, annuities, and IRA's. See secs. 72(a), (e), 408(d). Section 1.72-1(a), Income Tax Regs., provides that section 72 prescribes rules relating to the inclusion in gross income of amounts received under a life insurance, endowment, or annuity contract unless such amounts are specifically excluded from gross income under other provisions of chapter 1 of the Code. The burden is on petitioner to demonstrate that the payments in question fall into a specific statutory exclusion. See Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429-431 (1955).

In this case, petitioner received IRA distributions of $89,100 and $29,500 in 1995 and 1996, respectively. Additionally, petitioner received $39,506 in total pension and annuity plan distributions in 1996.[3] Petitioner provided no evidence nor have we found anything in the record suggesting that any part of the IRA or pension and annuity plan distributions are excludable from gross income. Accordingly, we conclude that petitioner received gross income of $89,100 in 1995 and $69,006 in 1996.

---

[3]In the notice of deficiency, respondent determined that petitioner received $69,006 from IRA distributions in 1996. However, the parties stipulated that petitioner received $29,500 in total IRA distributions and $39,506 in total pension and annuity plan distributions in 1996. The parties' stipulation does not affect the total deficiency determined against petitioner.

Issue 4.  Whether Petitioner Is Liable for the 10-Percent
Additional Tax Under Section 72(t) on IRA Distributions Totaling
$37,500 and $29,500 in 1995 and 1996, Respectively

Under section 408(d)(1), a distribution from an IRA is taxable to the distributee in the year of distribution in the manner provided under section 72.  Section 72(t)(1) provides for a 10-percent additional tax on early distributions from qualified retirement plans.  Section 72(t)(2) excludes qualified retirement plan distributions from the 10-percent additional tax if the distributions are:  (1) Made on or after the date on which the employee attains the age of 59-1/2; (2) made to a beneficiary (or to the estate of the employee) on or after the death of the employee; (3) attributable to the employee's being disabled within the meaning of section 72(m)(7); (4) part of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the employee or the joint lives (or joint life expectancies) of the employee and his designated beneficiary; (5) made to an employee after separation from service after attainment of age 55;[4] (6) dividends paid with respect to stock of a corporation which are described in section 404(k).  A limited exclusion is also available for distributions made to an employee for medical care expenses.  See sec. 72(t)(2)(B).

---

[4]This provision, codified at sec. 72(t)(2)(A)(v), is not applicable to early IRA distributions.  See sec. 72(t)(3)(A).

At the times he received the distributions in question, petitioner was ages 57 and 58, respectively. Although respondent determined that petitioner had received some moneys on account of a disability in 1995 and 1996, petitioner presented no evidence that the IRA distributions in question were attributable to that disability. In fact, petitioner presented no evidence that any of the exceptions to the 10-percent additional tax listed above apply. Accordingly, we sustain respondent's determination and hold that petitioner is liable for the 10-percent additional tax in relation to IRA distributions totaling $37,500 and $29,500 in 1995 and 1996, respectively.

Issue 5. Whether Petitioner Is Liable for an Accuracy-Related Penalty Pursuant to Section 6662(a) for Taxable Years 1995 and 1996

The last issue for decision is whether petitioner is liable for an accuracy-related penalty pursuant to section 6662(a). Section 6662(a) imposes a penalty of 20 percent of the portion of the underpayment which is attributable to negligence or disregard of rules or regulations. See sec. 6662(b)(1). Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. See Neely v. Commissioner, 85 T.C. 934, 947 (1985). The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c). No penalty shall be imposed if it is shown that there was reasonable cause for such portion of the

underpayment and the taxpayer acted in good faith with respect to the underpayment. See sec. 6664(c). It is well established that petitioner bears the burden of proof on this issue. See Bixby v. Commissioner, 58 T.C. 757, 791 (1972).

Petitioner has not sustained his burden. In 1995, petitioner claimed losses from the automobile drag racing activity aggregating $70,428.52 with no apparent expectation that the activity would ever become profitable. Petitioner's participation in this activity was predominantly for pleasure and recreation. Additionally, we have found that the income petitioner reported as nontaxable in 1995 and 1996 should have been included in his gross income. Petitioner offered no basis at trial for his decision to report the income as nontaxable. Accordingly, we sustain respondent on this issue and hold that petitioner is liable for the accuracy-related penalty pursuant to section 6662(a) in 1995 and 1996.

Decision will be entered

for respondent.