T.C. Memo. 2000-288

UNITED STATES TAX COURT

RICHARD J. AND MELODIE D. MCKEEVER, Petitioners v. COMMISSIONER
OF INTERNAL REVENUE, Respondent

Docket No. 4130-97.                    Filed September 14, 2000.

B. Paul Husband, for petitioners.

Jordan S. Musen and Michael H. Salama, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, Judge: Respondent determined the following
deficiencies and accuracy-related penalties with respect to
petitioners' Federal income taxes:

| Year | Deficiency | Accuracy-related penalty sec. 6662(a) |
|------|-----------|----------------------------------------|
| 1991 | $16,902 | $3,380 |
| 1992 | 21,165 | 4,233 |
| 1993 | 29,073 | 5,815 |

After concessions,[1] the issues remaining for decision are whether petitioners' horse activity during the years at issue was an activity not engaged in for profit within the meaning of section 183(a),[2] and whether petitioners are liable for accuracy-related penalties on account of negligence under section 6662(a) for the years at issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first and second stipulations of facts are incorporated in this opinion by this reference.

The Petitioners

Richard J. and Melodie D. McKeever (petitioners) resided in Norco, California, on the date they filed their petition in this case.

---

[1]Petitioners conceded that they received $28,000 of unreported taxable commission income in 1993 and that respondent's determinations for 1991 and 1992 are not time barred by the statute of limitations.

[2]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Monetary amounts are rounded to the nearest dollar.

At all relevant times, Richard J. McKeever was the sole shareholder, chief executive officer, and general sales manager of Aero Industrial Alloy, Inc., a metals distributing business. Mr. McKeever does not hold a college degree.

Since at least 1986 and continuing through the date of trial, Melodie D. McKeever has been employed full time as a medical technologist by Kaiser Permanente. Mrs. McKeever received a bachelor of science degree in microbiology, with an emphasis in premed for veterinarians, from Long Beach State University in 1972.

Mrs. McKeever has been involved with horses her entire life. As a child, Mrs. McKeever spent time with horses on her grandfather's and uncle's ranches. When her father was stationed in Barstow, California, Mrs. McKeever cleaned stalls and did other volunteer work at the U.S. Marine Corps stables in exchange for lessons in riding and horsemanship. From 1975 until 1983, Mrs. McKeever was a member of Equestrian Trails, Inc., an organization devoted to maintaining trails throughout California. Mrs. McKeever served as the secretary of her local chapter for 2 years. Prior to 1988, Mrs. McKeever owned two horses: A grade gelding and a quarter horse mare.

Commencement of the Horse Activity

In 1987, petitioners began their horse activity. Petitioners did not have any prior employment history or business

experience in breeding, showing, or selling horses. By the time they began their horse activity, petitioners had acquired only general experience in owning, caring for, and riding horses. Petitioners have never taken any classes or attended any programs regarding the financial or business aspects of horse breeding and showing.

Petitioners chose the paso fino breed for their horse activity for a variety of reasons. Petitioners admired paso finos for their beauty and smooth-gaited ride. Petitioners also decided that, because of their smooth ride, paso finos are good for people, like Mr. McKeever, who have back problems. Prior to starting their horse activity, petitioners did not research the marketability of the paso fino breed or determine how they were most likely to make money with paso fino horses. Petitioners did not seek business advice prior to purchasing their first paso fino horses.

In August 1987, petitioners purchased their first two paso fino horses, Chispa Nuac and Sol Rey de Pito, from Dorothy Sarnecky for a total of $15,000. During 1988, petitioners had discussions with Ms. Sarnecky and Charles Minter which confirmed petitioners' perception that paso finos have an excellent disposition and that they are marketable.

Petitioners' Advisers

In 1988, petitioners used Mr. Minter as a breeding and sales consultant and horse trainer. Petitioners did not pay Mr. Minter for his advice. Petitioners initially approached Mr. Minter for advice on breeding and showing Chispa Nuac, the mare they had purchased from Ms. Sarnecky. Mr. Minter has served on the board of directors and several committees, including the ethics committee, of the Paso Fino Horse Association. His ranch, Rancho Paso Bravo, has approximately 125 paso finos.

From 1988 through 1992, petitioners purchased at least 10 horses from or through Mr. Minter. All the horses were mares, except for one gelding included in a six-horse dispersal sale. Several of the horses purchased in that sale were untrained. Other horses purchased from or through Mr. Minter during the years 1988-92 had health problems which made them unsuitable for riding or showing.[3]

At some point during 1991, petitioners began consulting with other paso fino breeding and training experts. They did so after talking with successful owners and trainers at horse shows. As a

---

[3]For example, in June 1988, petitioners purchased Adelita LaCe. Adelita LaCe had a "hitching" gait condition in her rear left leg. Mrs. McKeever had the mare examined by a veterinarian, who stated that she had severe osteoarthritis due to an injury. However, Mrs. McKeever expected that Adelita LaCe would still be adequate for breeding purposes.

result of these conversations, petitioners began to question their reliance on Mr. Minter's advice.

In March 1992, petitioners purchased six horses from Richard Howe in a package deal for $15,000. Mr. Minter brokered the deal. The package consisted of five mares and a gelding. One of the mares was trained, one was partly trained, and the rest were untrained.

Petitioners placed Bonita Bravo, a brood mare and show horse purchased as part of the package deal, in training under Mr. Minter and Favio Arias at Mr. Minter's ranch. During 1992 and while at Mr. Minter's ranch, Bonita Bravo suffered a cut to her tongue.[4] As a result of the injury, Bonita Bravo was never shown.

The injury to Bonita Bravo led petitioners to end their business relationship with Mr. Minter. Petitioners were unhappy with many of the horses they had purchased from Mr. Minter. Although Mr. Minter had a trade-in policy that allowed dissatisfied customers to trade in unsatisfactory animals, the time limit on the policy effectively limited its application to animals purchased for riding, as opposed to breeding stock. Moreover, although Mr. Minter arranged prepurchase veterinary examinations of animals he purchased for Rancho Paso Bravo, he

---

[4]A trainer may cut a horse's tongue by being overly harsh during training. Horses with cut tongues cannot hold a bit in their mouths.

advised petitioners not to obtain veterinary examinations of any horses purchased from him or through him.  Petitioners did not have a veterinarian examine any of the horses purchased from Mr. Minter either prior to or immediately after their purchase.

During 1991, Mrs. McKeever hired Diego Palacio as a trainer for petitioners' horses.  Mr. Palacio introduced petitioners to Carlos Cortelezzi, D.V.M., who became petitioners' mentor and principal adviser concerning their horse activity.  Dr. Cortelezzi first saw petitioners' horses in 1993, and since then, he has given petitioners general advice on improving the quality of their herd.[5]  He also advised them to purchase several mares in 1994 from a third party.  Several younger horses, including El Niño Cisco de Norco, were purchased with the mares.  The total purchase price of the horses purchased in 1994 was $25,000.

Breeding Activities

Since the acquisition of their first mare in 1987, petitioners have attempted to expand their herd through breeding, with mixed results.  A number of setbacks have hampered petitioners' attempts to breed their horses.

---

[5]Petitioners generally have followed Dr. Cortelezzi's advice.  However, when Dr. Cortelezzi was out of the country for 3 years, petitioners made their own decisions regarding which animals to use for breeding.  Petitioners have negotiated with Dr. Cortelezzi regarding purchases of breedings from his stallion, and Dr. Cortelezzi co-owns at least one of petitioners' horses.

In 1989, petitioners purchased three breedings from Mr. Minter's stallion, Bochica Tres, for a total of $8,000. Bochica Tres has been a "top-ten stallion" many times. However, the foals produced as a result of these breedings were all unsatisfactory and eventually sold at or below the cost of Bochica Tres' stud fee.

In 1994, petitioners began using one of their home-foaled horses, Sindicato de Norco, as a breeding stallion. Although he sired two foals, neither foal met petitioners' quality standards, and Sindicato de Norco was gelded in 1997.[6]

The breeding history with respect to petitioners' brood mares through and including the years at issue is summarized in the following chart:

---

[6]Since 1996, petitioners have used El Niño Cisco de Norco as their herd sire. In 1997, petitioners began using transported semen from well-known paso fino stallions to inseminate some of their mares.

| YEAR | MARE | BREEDING HISTORY | BREEDING RESULTS |
|------|------|------------------|------------------|
| 1989 | Chispa Nuac[1] | Bred to Bochica Tres | Dominador Bravo |
|  | Adelita LaCe | Bred to Rey La Joya | Cassandra del Rey |
|  | Dulcinea del Rey | Bred to Reyzuelo Bravo | Did not take |
| 1990 | Adelita LaCe | Bred to Dios del Mar Bravo | Did not take |
|  | Bernardita LaCe[2] | Bred to Bochica Tres | Filly died at birth |
|  | Dulcinea del Rey | Bred to Dios del Mar Bravo | Preciosa de Dios |
|  | Bonita Bravo | Bred to Flamenco del Moro | Sindicato de Norco |
|  | Flint Oak Aura[3] | Bred to Festival Dos | Did not take |
| 1991 | Chispa Nuac | Bred to Bochica Tres | Did not take |
|  | Adelita LaCe | Bred to Dios del Mar Bravo | El Capital de Norco |
|  | Bernardita LaCe | Bred to Bochica Tres | Did not take |
|  | Bonita Bravo | Bred to Paco Bravo | Antoinetta de Norco |
|  | Flint Oak Aura | Bred to Bochica Tres | Did not take |
| 1992 | Chispa Nuac | Bred to Bochica Tres | Did not take |
|  | Adelita LaCe | Bred to Bochica Tres | Miranda de Norco |
|  | Bernardita LaCe | Bred to Bochica Tres | Did not take |
|  | Dulcinea del Rey | Bred to Santo Humo | La Duquesa de Norco |
|  | Flint Oak Aura | Bred to Impetuoso del Ocho | La Tempestad de Norco |
|  | Vanescita de Caroline | Bred to Bochica Tres | La Briesa de Norco |
|  | Bernardita LaCe | Bred to Bochica Tres | Did not take |
|  | Lobo Lucinda de Oro | Bred to Impetuoso Del Ocho | Did not take |
| 1993 | None |  |  |

[1] This mare was found to have an immune deficiency, resulting in constant infections.  She was successfully bred only once (1989).  Further attempts to breed her were unsuccessful despite extensive medical treatment.

[2] As a result of a difficult delivery, this mare developed a large hematoma and bladder tumors.  Further attempts to breed her were unsuccessful.

[3] Eventually, petitioners discovered that Flint Oak Aura needed to receive medication in order to carry a foal.

## Marketing Petitioners' Horses

Petitioners sponsored various California horse shows where they showed their horses.  In 1990, petitioners commissioned an oil painting and a portrait of Chispa Nuac.  Petitioners also rode their horses in parades.  Paso finos are known as dancing horses because of their unique footfalls and are popular parade horses.  In 1993, petitioners obtained printed business cards for their horse activity and began handing out the cards in response to inquiries at parades.

Petitioners showed their horses and rode in parades during the years at issue.  In 1991 and 1992, respectively, petitioners paid the Paso Fino Horse Association $853 and $1,703 for advertising, sponsorship, registration, and other show-related expenses.  The record does not reflect the amount spent on those activities in 1993.  Petitioners kept videotapes of their horses competing in various shows.  Petitioners' horse show videos, through and including the years at issue, are of the following competitions:

| Year | Show | Horse(s) Shown |
|------|------|----------------|
| 1988 | West Coast Championships | Chispa Nuac |
|      | Los Angeles Equestrian Center | Flint Oak Aura |
|      | Santa Barbara | Chispa Nuac |
| 1989 | Paso Fino National | Flint Oak Aura |
|      | Ventura All Breed | Adelita LaCe |
|      | Scottsdale All Breed | Dulcinea del Rey Chispa Nuac |
|      | Santa Barbara | Dulcinea del Rey Bernardita LaCe |
|      | West Coast Championship | Dulcinea del Rey |
| 1990 | National Championship | Flint Oak Aura |
| 1991 | Springbreed Classic | Flint Oak Aura |
|      | West Coast Championship | Flint Oak Aura Dulcinea del Rey |
| 1992 | Indio Show | Flint Oak Aura |
|      | Lancaster Show | Flint Oak Aura |
|      | West Coast Championship | Flint Oak Aura |
| 1993 | Del Mar National | Preciosa de Dios Anna Maria Bravo |

Paso fino horses are shown in three categories: Pleasure, performance, and classic fino. The categories are based on the horses' ability to perform the gaits required of each class. Classic fino is the quickest, most difficult gait to perform, and horses able to perform classic fino are the most sought after within the paso fino breed. Classic fino horses that win at the national level are worth at least $50,000, and a champion mare is valued at $250,000 or more. Petitioners hoped to acquire horses that could compete and be sold in the classic fino market.

The market for paso finos, especially classic fino horses, is concentrated in Florida; some sales of high-priced horses, however, have occurred in California. During the years in issue, petitioners marketed their horses by advertising in regional publications, such as the California Horsetrader, and by posting flyers at their local feed stores.

Petitioners claimed advertising expenses on their Federal income tax returns of $380 for 1992 and zero for 1991 and 1993. In contrast, petitioners' expense journals show advertising expenses of $372 in 1991 and $486 in 1993. The expense journals do not indicate petitioners' total advertising expenditures for 1992.

Petitioners have held open houses and fun shows at their ranch, where potential customers may test ride the horses. Petitioners' E-mail address is Pasolove@aol.com. Petitioners did

not list Rancho Paso de Norco in the phone book or with directory assistance.

Petitioners' Horse Sales

From 1987 through the years at issue, petitioners did not sell any horses.[7]  Since 1991, when petitioners were advised by Diego Palacio to cull their herd of animals unlikely to produce classic fino horses, petitioners have been attempting to sell horses.  They sold their first horse in 1994.  All of their sales occurred in California.  The sales of petitioners' horses are shown on the following table:

---

[7]In 1988, petitioners traded Sol Rey de Pito in partial payment for Adelita LaCe.

| Date | Horse | Original Purchase Price | Sales Price |
| --- | --- | --- | --- |
| 02/04/94 | Lozano Bravo | $3,646 | [1]$3,000 |
| 02/05/94 | Cassandra del Rey | Home-foaled | 4,000 |
| 03/31/95 | Molly Dakota | 1,500 | [1]2,000 |
| 06/16/95 | El Dominador Bravo | Home-foaled | 3,000 |
| 10/17/95 | Vanescita de Caroline | 1,000 | 1,078 |
| 10/25/95 | El Capitan de Norco | Home-foaled | 2,000 |
| 03/29/96 | Anna Maria Bravo | 1,500 | 5,385 |
| 05/05/96 | La Briesa de Norco | Home-foaled | 2,000 |
| 05/20/96 | El Principe de Angelita | Home-foaled | 1,000 |
| 06/01/96 | San Miguel de Norco | 850 | 3,770 |
| 06/21/96 | Miranda de Norco | Home-foaled | 2,000 |
| 01/20/97 | La Duquesa de Norco | Home-foaled | 4,000 |
| 03/17/97 | Mystique Bravo | 1,000 | 3,500 |
| 06/11/97 | El Hechicero de Norco | 500 | [2]4,000 |
| 08/09/97 | Valentino de Norco | Home-foaled | 750 |
| 08/17/97 | Monarquillo de Intocable | 500 | 4,500 |
| 12/17/97 | Misterio de Resorte | Home-foaled | 3,500 |
| 03/ /98 | Molly Dakota | 1,500 | [3]3,000 |
| 06/06/98 | Esperanza de Norco | unknown | 4,000 |
| unspecified | Sindicato de Norco | unknown | [1]3,000 |

[1]Returned by purchaser.

[2]The evidence is conflicting as to whether the sales price is $4,000 of $4,500.

[3]The purchaser paid an additional $1,000 for a breeding to El Niño Cisco de Norco.

All of the above sales were culling sales.  The record does not reflect the amount of feed, training, or veterinary expense incurred per horse.  Because petitioners did not allocate feed, training, or other expenses such as stud fees  among their horses, the record does not reflect the economic profit, if any, earned on each sale.

Value of Petitioners' Herd

As of July 1998, petitioners' herd consisted of 26 horses with a total value of approximately $307,000.  The majority of the animals owned as of that date were foaled by petitioners'

brood mares. The purchase price of a new brood mare, Sopresa de Capuchino, is not in the record. The fair market values and original purchase prices of the remaining purchased horses totaled $103,500 and $87,838, respectively.

During the years at issue and through the date of trial, petitioners did not maintain equine mortality insurance because they felt the insurance was too expensive. Although petitioners maintained fire and liability insurance on their ranch, the record does not reflect whether that insurance covered any horse-related losses.

Petitioners' Time and Effort

Petitioners managed and operated their horse activity themselves. Since 1988, petitioners have been members of the Paso Fino Horse Association and the California Paso Fino Horse Association. During 1992, 1993, 1994, and 1995, petitioners were members of the American Horse Show Association. During 1996 and 1997, Mrs. McKeever was a member of the Norco Paso Fino Drill Team.

During the years in issue, petitioners fed their horses twice daily; cleaned, clipped, and groomed their horses daily; and exercised, conditioned, and trained their horses 4 days each week.[8] Petitioners bred and foaled their horses. Petitioners

---

[8]Starting in 1991, most horses were kept at petitioners' Norco ranch. Previously, petitioners had boarded the majority of (continued...)

also took blood samples from, wormed, and inoculated their horses. In addition, Mr. McKeever handled and halter trained weanling paso finos until they reached the age of 2-1/2 years. Petitioners hired someone to clean the Norco ranch stables.

Petitioners love their horses and enjoy the work associated with the horse activity.

## Purchase of the Norco Facility

Petitioners resided in Anaheim, California, when they began their horse activity. They sold their residence during 1987 and moved to Yorba Linda, California. The Yorba Linda residence had a four-stall barn. In 1991, petitioners sold the Yorba Linda residence and purchased a 3.6-acre ranch in Norco, California, for approximately $316,000 (the ranch). City zoning allowed petitioners to keep approximately 39 horses on the ranch. By 1998, the ranch had in excess of 20 horse stalls and pasture space capable of accommodating an additional 10 horses.

After they moved to the ranch, petitioners improved it in several respects. Beginning in 1991, petitioners expanded the then-existing barn and constructed an additional barn, an arena, and a round pen. They graded and installed an irrigation and drainage system, and they installed pipe corrals and fencing. By the end of 1994, petitioners substantially had completed

---

[8](...continued)
their herd at Mr. Minter's Rancho Paso de Bravo and visited the animals on weekends.

construction of the barns and the round pen, gradation and installation of irrigation lines, and installation of the pipe corrals and fencing. Petitioners also installed benches with a view of the arena and a fino board, which is used to hear the sound of the paso fino's four-beat gait. Petitioners spent $6,546 on corrals and arenas, but the record does not reflect clearly the total cost for all horse-related improvements.

The ranch is modest and functional. It does not have a swimming pool or a tennis court. There is a sign for the ranch near the street, making it identifiable to passersby and to people looking for the ranch.

During the years at issue and through trial, petitioners resided at the ranch. In 1993, Mr. McKeever applied for a loan; on his loan application, he listed the ranch as his residence, not as an income-producing property. In 1998, petitioners had the ranch appraised. The appraisal valued the ranch at $409,000.

Petitioners' Books and Records

The ranch has an office with a separate entrance where petitioners keep a library of videos and the books and records for their horse activity. From 1987 through the years at issue, Mrs. McKeever provided bookkeeping services for the horse activity. Petitioners used one of their then-existing checking accounts (709 account) to pay expenses associated with their horse activity. The records kept consisted of copies of

invoices, receipts, and other documents, which Mrs. McKeever placed in a manila envelope each month.  At the end of each taxable year, Mrs. McKeever compiled annual expense journals from the stored documents.

Petitioners also kept pedigrees and show records for their horses.  Starting in about 1993, Mr. McKeever began studying bloodlines and pedigrees.  Petitioners did not keep heat and health records for their horses, except for copies of veterinary bills and notations made on a small calendar kept in their barn.

Petitioners did not prepare written profit and loss projections for the taxable years 1991, 1992, and 1993 concerning their horse activity, or any of their other activities, nor have they prepared any such projections for taxable years commencing after 1993 through the trial in this case.[9]

---

[9]In 1998, after the petition in this case had been filed, petitioners consulted an accountant with experience in the horse industry, Patrick J. Hurley.  At Mr. Hurley's suggestion, petitioners began using a computerized record keeping system. Mr. Hurley provided petitioners with a sample "Summary of Operations" for a horse business and advised them to prepare a similar document.  Petitioners prepared a summary of operations for their horse activity for the years 1988 through 1998, which they refer to as a business plan.  The document summarizes various facts related to the horse activity and indicates in very general terms how petitioners plan to improve the profitability of the activity.  The document does not indicate what level of income would be required to achieve profitability or to what extent expenses might be reduced.  Although petitioners maintained detailed expense records, the summary of operations does not analyze any of the past expenses to determine whether any adjustments to those expenses could improve profitability.

Petitioners' books and records for the years at issue were adequate to substantiate all expenses claimed on their Federal income tax returns with respect to their horse activity in those years.

Petitioners' Other Activities

Petitioners owned and operated two other alleged businesses: A dog breeding business and an antiques business. These ventures generally were not profitable. Petitioners discontinued the dog breeding operation because they purportedly believed that the horse activity would be more profitable and because the owner of a quality stud dog moved out of State. The antiques operation was discontinued because the shopping mall in which petitioners had been renting space was leveled for a freeway and because Mr. McKeever, who refinished some of the items himself, was beginning to suffer adverse health effects because of exposure to the refinishing chemicals.

Income Tax Returns

Petitioners timely filed a Form 1040, U.S. Individual Income Tax Return, for each of the years at issue. Petitioners reported income and expenses from their horse activity on either Schedule C, Profit or Loss from Business, or Schedule F, Profit or Loss From Farming, for the years 1987 through 1997, inclusive. Losses from the horse activity over the years 1987 through 1997 totaled $542,751.

During the years at issue, petitioners' returns were prepared by the office of Maurice Joffe, C.P.A. When the returns were filed, Mr. Joffe believed them to be correct, based on his understanding of the facts and the then-applicable law.

Petitioners reported gross receipts, including income from sales of horses reported on Form 4797, Sales of Business Property, and Form 6252, Installment Sale Income, from their horse activity as follows:

| Year | Gross Receipts |
|------|---------------|
| 1987 | -0- |
| 1988 | $520 |
| 1989 | -0- |
| 1990 | -0- |
| 1991 | -0- |
| 1992 | -0- |
| 1993 | 818 |
| 1994 | 7,400 |
| 1995 | 7,223 |
| 1996 | 15,843 |
| 1997 | 24,206 |
| Total | $56,010 |

Petitioners reported wage income, Schedule C or Schedule F business income (loss), and adjusted gross income from 1987, when petitioners began their horse activity, through 1997, as shown in the following table:

| Year | Wages and other income[1] | Horse activity income (loss) | Dog activity income (loss) | Antiques activity income (loss) | Adjusted gross income |
|------|------|------|------|------|------|
| 1987 | $76,516 | ($12,918) | ($1,099) | ($11,359) | $57,090 |
| 1988 | 78,008 | (21,675) | (816) | 1,945 | 58,882 |
| 1989 | 92,893 | (28,223) | 236 | 9,209 | 57,430 |
| 1990 | 124,663 | (53,037) | (316) | (7,491) | 66,208 |
| 1991 | 141,724 | (55,843) | N/A | (7,126) | 81,205 |
| 1992 | 148,169 | (70,598) | N/A | (5,886) | 73,434 |
| 1993 | 171,379 | (64,886) | N/A | N/A | 81,076 |
| 1994 | 205,580 | (66,880) | N/A | N/A | 140,806 |
| 1995 | 159,117 | (51,175) | N/A | N/A | 109,309 |
| 1996 | 139,049 | (56,853) | N/A | N/A | 92,794 |
| 1997 | 165,083 | (60,663) | N/A | N/A | 115,982 |

[1]Includes income from all other sources except the horse activity and the dog breeding and antiques ventures.

Notice of Deficiency

Following an examination of petitioners' Federal income tax returns for 1991, 1992, and 1993, respondent issued a notice of deficiency in which he determined that (1) petitioners' horse activity in those years was an activity not engaged in for profit under section 183 and expenses claimed with respect to the horse activity were disallowed, except as allowed by section 183(b), (2) petitioners had failed to report commission income of $28,000, (3) computational adjustments to petitioners' itemized deductions were required because of the preceding adjustments, and (4) petitioners were liable for the negligence prong of the accuracy-related penalty under section 6662(a).

OPINION

I.    Whether Petitioners Operated Their Horse Activity for a Profit

A.    In General

The principal issue before us is whether petitioners' horse activity constituted "an activity not engaged in for profit" within the meaning of section 183 during 1991, 1992, and 1993.

Section 183(a) provides that if an activity is not engaged in for profit, no deduction attributable to the activity shall be allowed except as provided in section 183(b).  Section 183(b)(1) allows those deductions which otherwise are allowable regardless of profit objective.  Section 183(b)(2) allows those deductions which would be allowable if the activity were engaged in for profit, but only to the extent that gross income attributable to the activity exceeds the deductions permitted by section 183(b)(1).  Section 183(c) defines "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

Deductions are allowable under section 162 for the expenses of carrying on an activity which constitutes a trade or business of the taxpayer.  See sec. 162; sec. 1.183-2(a), Income Tax Regs. To be engaged in a trade or business with respect to which deductions are allowable under section 162, "the taxpayer must be involved in the activity with continuity and regularity," and

"the taxpayer's primary purpose for engaging in the activity must be income or profit".  Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); see also Warden v. Commissioner, T.C. Memo. 1995-176, affd. without published opinion 111 F.3d 139 (9th Cir. 1997).

This case is appealable to the Court of Appeals for the Ninth Circuit, which applies a primary purpose standard to test whether an alleged business activity has the requisite profit motive under sections 162 and 183.  That standard is "whether the activity was entered into with the dominant hope and intent of realizing a profit."  Vorsheck v. Commissioner, 933 F.2d 757, 758 (9th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1994-281; see also Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993) ("Profit must be the predominant, primary or principal objective), affg. T.C. Memo. 1991-212; Machado v. Commissioner, T.C. Memo. 1995-526, affd. without published opinion 111 F.3d 139 (9th Cir. 1997); Warden v. Commissioner, supra.  We apply that standard here.

Whether the requisite profit objective exists is to be resolved on the basis of all the surrounding facts and circumstances of the case.  See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs.  The taxpayer's expectation of profit need not be reasonable, but it must be bona fide.  See Golanty v. Commissioner, supra at 426.

Although our analysis focuses on the subjective intention of the taxpayer, greater weight is given to objective facts than to a taxpayer's mere statement of intent. See Independent Elec. Supply Inc. v. Commissioner, 781 F.2d 724 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. For purposes of section 183, the term "profit" means economic profit, independent of tax savings. Drobny v. Commissioner, 86 T.C. 1326, 1341 (1986), affd. 113 F.3d 670 (7th Cir. 1997). Petitioners bear the burden of proving that they had the requisite profit objective. See Rule 142(a); Golanty v. Commissioner, supra at 426.

Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors that normally should be taken into account in determining whether the requisite profit intent has been shown. The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if

any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.  No single factor is determinative, see sec. 1.183-2(b), Income Tax Regs., and not all factors are applicable in every case; see Allen v. Commissioner, 72 T.C. 28, 34 (1979).

Petitioners assert that breeding and raising horses for sale has long been recognized as a trade or business meeting the profit requirements for deductibility, that a history of losses during the startup phase of their enterprise does not vitiate their profit motive, and that the objective facts demonstrate that they had the requisite profit objective.  Conversely, respondent argues that the evidence demonstrates a lack of profit motive and that petitioners' horse activity was not engaged in primarily for profit.

B.  Applying the Factors

1.  Manner in Which Activity Conducted

In deciding whether a taxpayer has conducted the activity in a businesslike manner, we consider whether complete and accurate books and records were maintained, whether the activity was conducted in a manner substantially similar to other activities that were profitable, and whether changes in operating methods, adoption of new techniques, or abandonment of unprofitable methods were made in a manner consistent with an

intent to improve profitability.  See Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979); sec. 1.183-2(b)(1), Income Tax Regs.

Petitioners contend that they operated their horse activity in a businesslike manner because they maintained accurate books and records, persevered in their sales and marketing efforts, culled their herd and focused on the highly marketable registered paso fino breed, and changed operating methods.

Respondent asserts that the books and records served no part in controlling costs and increasing profitability, that anemic and ineffective sales and marketing efforts do not support a profit motive, that petitioners continued to breed horses from the bloodline allegedly culled, and that the changes in operating methods were insufficient to materially affect the activity's profitability.  Respondent also asserts that petitioners used poor business practices in carrying on the activity.

### a.  Petitioners' Record Keeping

Petitioners maintained copies of invoices and checks which documented horse-activity expenses and which were used to prepare an expense journal at the close of each taxable year.  The maintenance of these limited records, however, represents nothing more than petitioners' substantiation of the expenses claimed on their returns.  As we have stated previously:

> The purpose of maintaining books and records is more
> than to memorialize for tax purposes the existence of

the subject transactions; it is to facilitate a means of periodically determining profitability and analyzing expenses such that proper cost saving measures might be implemented in a timely and efficient manner. [Burger v. Commissioner, T.C. Memo. 1985-523 (citing Golanty v. Commissioner, 72 T.C. 411, 430 (1979)), affd. 809 F.2d 355 (7th Cir. 1987).]

The 1992 and 1993 expense journals admitted into evidence were merely summaries of the expenses reflected on the checks and receipts; they were not used to improve the performance of petitioners' losing venture. See Steele v. Commissioner, T.C. Memo. 1983-63 (checks served as adequate substantiation for claimed expenses but were not businesslike records).

While a taxpayer need not maintain a sophisticated cost accounting system, the taxpayer should keep records that enable the taxpayer to make informed business decisions. See Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523. For a taxpayer's books and records to indicate a profit motive, the books and records should enable a taxpayer to cut expenses, increase profits, or evaluate the overall performance of the operation. See Abbene v. Commissioner, T.C. Memo. 1998-330.

Petitioners presented no evidence that their records were used to implement cost-saving measures or to improve profitability. Petitioners urge us to consider their tax returns, which contain depreciation schedules, expense summaries, and other information from which business decisions could be made

and the considerable volume of documentation that served to substantiate the claimed expenses, as well as the pedigrees that were kept for their horses. Finally, petitioners refer us to the testimony of their current accountant, Mr. Hurley, to demonstrate that their records during the years at issue were adequate and consistent with a profit motive.

Although petitioners' records were voluminous, the record demonstrates that petitioners' record keeping was nothing more than a conscious attention to detail. See Golanty v. Commissioner, 72 T.C. at 430. The records were not used to review and reduce expenses or to enhance the possibility of generating income. For example, Mrs. McKeever testified that there were no written records that provided per-horse information regarding the cost to maintain the horse but that such information existed in her mind such that she could approximate the cost to maintain a horse. She failed to demonstrate, however, that she actually possessed such information, or that she used it in an effort to achieve an economic profit from the horse activity. See, e.g., Steele v. Commissioner, supra (failure to keep track of expenses on a per-animal basis implies lack of profit motive). Because petitioners failed to use the existing books and records to minimize their expenses or otherwise foster profitability, the fact that they maintained records does not indicate that the activity was carried on with a

profit motive.  See <u>Sullivan v. Commissioner</u>, T.C. Memo. 1998-367 (generally no profit motive where lack of evidence that taxpayer used records to improve losing venture), affd. without published opinion 202 F.3d 264 (5th Cir. 1999).

Petitioners also failed to prepare any financial statements, profit and loss projections, budgets, breakeven analyses, or marketing surveys, all of which can be significant financial tools to aid in "cutting expenses, increasing profits, and evaluating the overall performance of the operation." <u>Golanty v. Commissioner</u>, <u>supra</u> at 430.  We conclude that petitioners' maintenance of books and records was simply to memorialize for tax purposes the various expenses associated with the activity.  That petitioners were able to substantiate their claimed expenses simply does not prove that their books and records were kept or used in a businesslike manner.

      b.  <u>Petitioners' Involvement in Other Profitable Enterprises</u>

There is no evidence in the record that shows how petitioners operated or participated in other profitable enterprises, such as Mr. McKeever's employer, Aero Industrial Alloy.  Thus, we are unable to consider whether the horse activity was operated in a similar manner.  See sec. 1.183-2(b), Income Tax Regs.

c. Changes Made To Foster Profitability

Petitioners claim that several changes in operating methods support their claim of businesslike operation. First, in 1991, petitioners purchased the Norco ranch, where they could board their herd. Second, they changed advisers from Mr. Minter to Dr. Cortelezzi. Third, petitioners changed their breeding program to focus on different bloodlines[10] in reliance on Dr. Cortelezzi's advice. Although we agree that these could be material changes, see Engdahl v. Commissioner, 72 T.C. at 667-668, petitioners have not convinced us that the changes had or will have a material impact on their horse activity's profitability; see Golanty v. Commissioner, supra at 428 (Changes must be sufficient to change materially the prospect of profitability). Petitioners have failed to show that the changes they made were sufficient to reduce their operating losses materially and to enhance materially their prospects of making a profit. See id.

Petitioners' plan with respect to the activity was to breed horses and sell the foals at a profit. See Phillips v. Commissioner, T.C. Memo. 1997-128 (written financial plan not required where business plan evidenced by action). Although, for each year at issue except 1993, petitioners attempted to breed

_____

[10]Respondent argues that petitioners' continued breeding of Mi Palabra belies the claim of changed bloodlines. The evidence, however, supports petitioners' claim that they switched to Colombian bloodlines.

their mares and sometimes used top-ranked stallions, their efforts to market their horses were unfocused and anemic prior to and during the years at issue. Petitioners did not sell any horses during the years at issue, and the only sales that have occurred through June 1998 have been culling sales. None of the changes made during the years at issue, including petitioners' reliance on Dr. Cortelezzi, had any material impact on profitability.

Petitioners' marketing and sales efforts have changed little since the inception of the enterprise. Relatively little has been spent on advertising. Cf. Burrow v. Commissioner, T.C. Memo. 1990-621. Petitioners advertised their operation and the availability of their horses in trade magazines, journals, and via local horse show sponsorships and parades. Petitioners also showed, on average, two or three of their horses each year at regional events on the West Coast. However, petitioners had no marketing plan; they did not even have business cards until 1993. Considering the importance of horse sales to their business plan, petitioners' failure to attempt to reach a larger customer base is not consistent with the behavior of a profit-minded taxpayer. See Dodge v. Commissioner, T.C. Memo. 1998-89, affd. without published opinion 188 F.3d 507 (6th Cir. 1999).

Finally, we note that none of the changes made by petitioners, ostensibly to reduce losses, control costs, and foster profitability, had any material effect. The amount of petitioners' losses did not decline following the move to the ranch, despite petitioners' claims that the move enabled them to perform ranch work and otherwise minimize expenses. The emphasis on new bloodlines did not result in any significant reduction in net losses.

Under the facts and circumstances of this case, "the trappings of a business" that exist are insufficient to demonstrate that petitioners' horse activity was carried on in a businesslike manner for profit. See Golanty v. Commissioner, 72 T.C. at 430. On balance, we conclude that petitioners did not operate their horse activity in a businesslike manner.

This factor favors respondent's position.

2. The Expertise of Petitioners or Their Advisers

Preparation for an activity by extensive study of its accepted business, economic, and scientific practices, or consultation with industry experts, may indicate a profit motive where the taxpayer carries on the activity in accordance with such practices. See sec. 1.183-2(b)(2), Income Tax Regs. Petitioners argue that Mrs. McKeever's background as a lifelong horsewoman provided sufficient expertise to indicate a profit motive. We disagree. We do not intend to denigrate Mrs.

McKeever's horse background, petitioners' conversations with trainers, or Mr. McKeever's study of bloodlines, but the record does not reflect that petitioners had any background in the business or economic aspects of horse breeding, showing, and selling, or that they sought advice prior to beginning the activity from those who did.

Petitioners purchased their first paso finos in 1987. There is no evidence that petitioners chose paso finos for their horse activity after consultation with expert advisers. Petitioners did not seek advice from Ms. Sarnecky or Mr. Minter until the following year. Although petitioners referred to Mr. Minter as a breeding and sales consultant, Mr. Minter was not paid for his advice. Both Mr. Minter's testimony and petitioners' testimony concerning the advice Mr. Minter gave to petitioners were vague. At best, it appears that the advice was general advice regarding showing and promoting horses, not business advice. While Mr. Minter's credentials are impressive, petitioners presented very little evidence that they sought advice from Mr. Minter on how to run a profitable horse business. On the record before us, we conclude petitioners did not investigate the economic viability of their proposed horse activity prior to its inception in 1987, nor did they consult with knowledgeable experts concerning the economic and business aspects of their horse activity.

Petitioners did not engage Dr. Cortelezzi until 1993, well after the start of their horse activity.  As in Daley v. Commissioner, T.C. Memo. 1996-259, petitioners decided to commence their activity with little concept of the expenses involved or of the steps required to achieve cost efficiency and an eventual profit.

Petitioners did not prepare for the economic aspects of the activity by study or consultation with experts, and they have not shown that, prior to inception of the activity, they had any concept of what their ultimate costs might be, how they might achieve any degree of cost efficiency, the amount of revenue they could expect, or what risks might impair the production of such revenues.  Accordingly, they were unprepared for the economic realities of the horse business.  See Rinehart v. Commissioner, T.C. Memo. 1998-205.

This factor favors respondent's position.

### 3. Petitioners' Time and Effort

The fact that a taxpayer devotes personal time and effort to carry on an activity may indicate an intention to derive a profit, particularly where there are no substantial personal or recreational elements associated with the activity.  See Daley v. Commissioner, supra; sec. 1.183-2(b)(3), Income Tax Regs.

While working full time, petitioners also managed and operated their paso fino activity during the years at issue.

Although someone was hired to clean stalls, petitioners fed their horses twice daily, washed, clipped, or groomed their horses daily, and exercised, conditioned, and trained their horses 4 days a week. Mrs. McKeever also kept the books and paid bills associated with the activity.

Subsequent to their move to the ranch in mid-1991, petitioners spent substantially all their free time on their horse activity. Although respondent argues that petitioners failed to establish the number of hours per week engaged in the horse activity, the stipulated facts confirm that petitioners must have spent considerable time and effort on mundane tasks pertaining to their horse activity.

The time and effort expended by petitioners on their horse activity supports their contention of profit motivation. Although petitioners love their horses and enjoy the work associated with the activity, many duties performed in connection with the activity do not have recreational aspects, such as feeding, washing, and worming the animals. Although some tasks, such as showing horses and riding in parades, have recreational aspects, on balance we conclude that petitioners' time and effort favor their contention that the activity was engaged in for profit. See sec. 1.183-2(b)(3), Income Tax Regs.

This factor favors petitioners' position.

   4.  <u>Expectation That Assets Used in the Activity Would</u>
<u>Appreciate in Value</u>

   "The term 'profit' encompasses appreciation in the value of
assets, such as land, used in the activity."  Sec. 1.183-2(b)(4),
Income Tax Regs.  Petitioners argue that their expectation that
their ranch and their horses would appreciate in value indicates
a profit motive.  Respondent disagrees for several reasons.
First, respondent argues that petitioners engaged in two separate
activities: petitioners bred and raised horses, and they owned a
ranch.  Second, respondent argues that petitioners have produced
no evidence showing that appreciation in their horses would cover
their past losses.  Petitioners argue that their ranch is a
business asset and that their assets (the ranch and the herd)
have increased in value by approximately $500,000, thus
demonstrating that their expectation of asset appreciation is
reasonable.

   Petitioners purchased the land primarily for reasons
related to their horse activity; profit from the property's
increase in value was a secondary consideration.  Petitioners'
ownership of the ranch and their horse-related activities are
considered a single activity for purposes of determining expected
asset appreciation under section 1.183-2(b)(4), Income Tax Regs.
See <u>Engdahl v. Commissioner</u>, 72 T.C. at 668 n.4.

   Petitioners were in the fifth year of their horse operation
when they purchased the ranch in 1991 for approximately $316,000.

Petitioners spent $6,546 on corrals and arenas to improve the ranch for use in their horse activity. The record does not reflect clearly the total cost for all the improvements. As of July 14, 1998, the fair market value of the ranch, based on its use as a horse ranch and residence, was $409,000.

As of July 1998, petitioners' horses had a fair market value of $307,000. Respondent's expert, Deborah McMahon-King, valued the herd at $289,500, while petitioners' expert, Dr. Cortelezzi, valued the herd at $496,500. Both reports were conclusory. Ms. McMahon-King's report offered at least some explanation for her valuation of specific horses, however, and we found her report more reliable than Dr. Cortelezzi's report. See Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441 (1980); Estate of Hinz v. Commissioner, T.C. Memo. 2000-6 (slip op. at 27 n.15) (citing 15 Mertens, Law of Federal Income Taxation, sec. 59.08 at 22 (1999)).

Ms. McMahon-King did not value three horses in the herd, La Sensacion de Norco, Presumida de Besilu, and Adelita LaCe. Dr. Cortelezzi valued these horses at $6,000, $15,000, and $3,500, respectively. We find that the horses had values of $6,000, $10,000, and $1,500, respectively, for a net addition of $17,500 to Ms. McMahon-King's figure of $289,500.[11]

---

[11] Our findings with respect to Sensacion de Norco and Presumida de Besilu are based upon Ms. McMahon-King's valuation
(continued...)

As of the time of trial, the majority of petitioners' herd consisted of home-foaled horses. The horses acquired by purchase had a total fair market value of $103,500. Petitioners' tax returns reflect that the cost of the purchased horses was $87,838. Thus, the purchased horses have increased in value by approximately 18 percent.

Petitioners argue that the appreciation shown by the assets used in the activity is powerful corroboration of their claimed profit motivation. Respondent argues that to prevail regarding this factor, petitioners' objective must be to realize a profit on the entire operation. See Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967).

We agree with petitioners that the question to be addressed here is not the ultimate issue in this case, i.e., petitioners' profit motivation, but whether the assets used in the activity were expected to appreciate in value. See sec. 1.183-2(b)(4), Income Tax Regs. We find petitioners had a bona fide expectation that at least some of the business assets would increase in value. That those assets actually increased in value weighs in

---

[11](...continued)
of horses with similar bloodlines. With respect to Adelita LaCe, we do not believe that Dr. Cortelezzi's estimation of $3,500 was realistic, considering that the mare's health problems preclude her use as a brood mare or riding horse. Our determination of value is based on our review of the record.

their favor, but it is not conclusive. Cf. <u>Engdahl v.</u>
<u>Commissioner</u>, <u>supra</u> at 668-669.

This factor favors petitioners' position.

5. <u>Petitioners' Past Successes in Other Activities</u>

That a taxpayer has engaged in similar activities in the
past and converted them from unprofitable to profitable
enterprises may indicate that the taxpayer is engaged in the
present activity for a profit, even though the activity is
presently unprofitable. See sec. 1.183-2(b)(5), Income Tax Regs.

Petitioners engaged in a dog breeding activity, which
operated at a net loss in 3 of 4 years for which petitioners' tax
returns reflect the operating results for that activity.
Similarly, petitioners' antiques activity also reported operating
losses in 5 of the 6 years for which its results are part of the
record. From the annual compensation that Mr. McKeever received
from Aero Industrial Alloy, Inc., we infer that Aero Industrial
Alloy, Inc., was successful.

Petitioners argue that they are entrepreneurial in nature,
and their history of ending unprofitable businesses supports
their contention of profit motivation. We disagree. Mrs.
McKeever testified that the dog activity was closed because the
owner of a quality stud dog moved away. Mrs. McKeever also
testified that she switched to the horse activity because she
thought horses would be more profitable than dogs. The antiques

operation was closed because the shopping mall in which the operation was located was displaced by a new freeway and because Mr. McKeever began suffering health impacts from the refinishing chemicals. The record as a whole does not support petitioners' contention that these ventures were closed because of their poor operating results.

In making our decision regarding petitioners' intent, we must give greater weight to the objective facts than to any mere statement of intent. See sec. 1.183-2(a), Income Tax Regs. The objective facts gleaned from petitioners' mixed results in their entrepreneurial ventures do not indicate a profit motive.

This factor, on balance, favors respondent's position.

### 6. Petitioners' History of Income or Loss

A taxpayer's history of income, losses, and occasional profits with respect to any activity may indicate the presence or absence of a profit objective. See Golanty v. Commissioner, 72 T.C. at 426; sec. 1.183-2(b)(6), Income Tax Regs. A horse racing and breeding activity may be engaged in for profit despite consistent losses during the initial startup phase. See Golanty v. Commissioner, supra at 427. We previously have found that the startup phase for an activity involving horses may be between 5 and 10 years. See Engdahl v. Commissioner, 72 T.C. at 669; Phillips v. Commissioner, T.C. Memo. 1997-128. Losses sustained beyond the period normally required to generate profits may

indicate the lack of profit motive unless such losses occurred because of unforeseen or unfortuitous circumstances.

Petitioners began their horse activity in 1987. From 1987 to 1997, petitioners reported losses in 11 consecutive years totaling $542,751.[12] During that same period, petitioners reported gross receipts of $56,010, all earned after the years at issue. The magnitude of the activity's losses in comparison with its revenues is an indication that petitioners did not have a profit motive. See Dodge v. Commissioner, T.C. Memo. 1998-89 (citing Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987)), affd. without published opinion 188 F.3d 507 (6th Cir. 1999).

Petitioners first argue that their losses were incurred during the startup phase of the activity. We agree that the years at issue, 1991-93, are startup years for the enterprise. As in Dodge v. Commissioner, supra, however, the massive losses are attributable more to petitioners' inability to generate significant sales of foals than to startup expenditures. Petitioners did not sell a horse until 1994, even though petitioners had several horses that they knew would not win in the show ring or produce marketable foals. Although petitioners'

---

[12]If gross income from a horse activity exceeds the deductions attributable to the activity during 2 out of 7 taxable years, a presumption arises that the activity is engaged in for profit. See sec. 183(d). Because petitioners' activity has never shown a profit, the statutory presumption does not apply.

horse activity generated some gross income during 1994 through 1997 as a result of culling the herd, the level of petitioners' operating losses remained relatively steady.

Dr. Cortelezzi testified that the market for paso finos became depressed in 1992. Petitioners maintain that a depressed horse market hampered their ability to sell horses. The depressed market, however, does not explain the absence of sales in earlier years. Similarly, petitioners' claim of higher than average veterinary expense fails to explain their losses. While petitioners suffered some breeding setbacks and lost horses due to medical problems, the veterinary expenses were a small fraction of overall expenses.

Petitioners' reliance on Mr. Minter also does not explain their history of losses. We need not decide whether petitioners received good advice from Mr. Minter. Even if we assume that petitioners relied on Mr. Minter to their detriment, it is far from clear that petitioners would have sold horses at a profit if they had not relied upon his advice. Petitioners ended their association with Mr. Minter in 1992. As of the date of trial, petitioners had not made any sales other than the culling sales. In sum, we do not find any of petitioners' explanations for their history of losses adequate to explain the magnitude and duration of those losses.

This factor favors respondent's position.

7.  <u>Amount of Occasional Profits</u>

The amount of profits earned in relation to the amount of losses incurred, the amount of the investment, and the value of the assets in use may indicate a profit objective.  See sec. 1.183-2(b)(7), Income Tax Regs.  The opportunity to earn substantial profits in a highly speculative venture may be sufficient to indicate that the activity is engaged in for profit even though only losses are produced.  See <u>id.</u>  In determining whether the taxpayer entered into the activity for profit, a small chance of making a large profit may indicate the requisite profit objective.  See <u>id.</u>

In 11 years of operation, petitioners' horse activity has never turned a profit.  Classic fino horses that win at the national level can sell for prices in excess of $250,000.  Petitioners claim to be focusing on that market and hope that one day their herd will produce such a horse.  Petitioners' professed belief that a champion horse could generate a substantial amount of revenue and correspondingly large profits may be indicative of profit motivation.  See <u>Dawson v. Commissioner</u>, T.C. Memo. 1996-417.

Under the circumstances of this case, however, we agree with respondent that the possibility of a speculative profit is insufficient to outweigh the complete absence of profits over a period of 11 years.  During the years at issue, none of

petitioners' horses were of the quality to generate top prices in the classic fino market. Even as late as the time of trial, petitioners had yet to show any of their horses at the national paso fino horse shows. During the years at issue, petitioners advertised their horses for sale at local feed stores and in classified ads in various horse publications. Petitioners' sales and marketing efforts were extremely limited and directed primarily, if not exclusively, toward the local and regional market. Petitioners' conduct during the years at issue simply does not support their assertion that a speculative profit in an amount sufficient to offset their accumulated losses from prior years was attainable by selling a national champion classic fino horse from their herd.

This factor favors respondent's position.

### 8. Financial Status of Petitioners

That the taxpayer does not have substantial income or capital from sources other than the activity in question may indicate that the activity is engaged in for profit. See sec. 1.183-2(b)(8), Income Tax Regs. Substantial income from sources other than the activity may be indicative of a lack of profit motivation, particularly where there are elements of personal pleasure or recreation involved. See id.

Although petitioners were able to reduce their taxable income by approximately $60,000 per year as a result of their

horse activity, this tax benefit resulting from the activity does not prove the absence of a profit motive. See Engdahl v. Commissioner, 72 T.C. at 670. It is, however, a factor to be considered. See Golanty v. Commissioner, 72 T.C. at 429.

The size of the horse-related expenditures in comparison to petitioners' adjusted gross income is substantial. In 1991, 1992, and 1993, petitioners reported wage income of $141,724, $148,169, and $171,379, respectively. During those same years, the horse activity lost $55,843, $70,598, and $64,886, respectively.

Petitioners argue that the level of expenses compared to their gross income favors their position since the amount is more than one normally would spend on a mere hobby. Respondent asserts that the substantial tax benefits, coupled with the enjoyment petitioners derived from their horses, suggest the activity was not engaged in for profit. We think there is some truth to both parties' assertions, but we do not fully agree with either party.

This factor does not favor either party's position in our analysis.

### 9. Elements of Personal Pleasure or Recreation

The existence of personal pleasure or recreation relating to the activity may indicate the absence of a profit objective. See sec. 1.183-2(b)(9), Income Tax Regs.

Petitioners argue that the only pleasurable aspect regarding their horse activity was riding in horse shows and parades.  Petitioners also argue that Mrs. McKeever saw the horse activity as a way to exit the field of hematology, from which she fears contracting a blood-borne illness.  Finally, petitioners argue that the size of their herd indicates that they are in the horse business for profit, not pleasure.  Respondent asserts that both petitioners enjoy riding horses and that the horses provide a social outlet for them, noting petitioners' involvement in parades and horse shows.  Respondent points to the fact that paso finos were chosen, in part, so that Mr. McKeever would be able to ride despite his back problems.  Respondent also notes Mr. Minter's testimony regarding the purpose for which Flint Oak Aura was purchased and cites petitioners' E-mail address (Pasolove@aol.com) as evidence of petitioners' emotional attachment to their horses.

We agree with respondent that substantial elements of personal pleasure and recreation are present in petitioners' horse activity.  However, "We also note that a business will not be turned into a hobby merely because the owner finds it pleasurable; suffering has never been made a prerequisite to deductibility.  'Success in business is largely obtained by pleasurable interest therein.'"  Jackson v. Commissioner, 59 T.C. 312, 317 (1972) (quoting Wilson v. Eisner, 282 F. 38, 42 (2d Cir.

1922).  The elements of personal pleasure are only one factor to be considered in determining whether the activity is engaged in for profit.  See sec. 1.183-2(b)(9), Income Tax Regs.

In this case, petitioners derived pleasure from their horse activity and were attached to their horses.  That attachment may explain why petitioners devoted so little effort to culling their herd, improving the quality of their horses, and reducing their operating expenses prior to 1994.

This factor favors respondent's position.

C.  Conclusion

On balance, we conclude that petitioners' horse activity during the years at issue was an activity not engaged in for profit within the meaning of section 183(c).  In reaching our decision, we have considered the factors listed in section 1.183-2(b), Income Tax Regs., all contentions presented by the parties, and the unique facts and circumstances of this case.

Petitioners engaged in their horse activity for at least 11 years, losing more than $500,000 on a cumulative basis. Petitioners did not generate a profit or even come close during any of the years at issue.  Although petitioners were dedicated to their horses, the totality of the objective facts and circumstances does not support petitioners' assertion that their horse activity was engaged in for profit.  Petitioners did not prepare for the economic realities of the business, and they did

not operate the activity in a businesslike manner.  While the activity, in theory, could have turned a profit had petitioners hit the lottery with a million-dollar horse, petitioners' prospect for doing so with their existing horses was negligible. The evidence simply is insufficient to convince us that petitioners were motivated primarily by profit during the years at issue.  The evidence is more consistent with the conclusion that petitioners enjoyed breeding and showing their horses and, therefore, were willing to sustain continuing losses despite the improbability of profits.  Cf. Dreicer v. Commissioner, 78 T.C. at 646.

We hold that petitioners' horse activity during the years at issue in this case was not engaged in for profit within the meaning of section 183(c).

II.  Whether Petitioners Are Liable for the Section 6662 Penalty

The only remaining issue is the applicability of the accuracy-related penalty for negligence during the years at issue.  Section 6662 imposes an accuracy-related penalty in the amount of 20 percent of any portion of an underpayment attributable to negligence or disregard of rules and regulations. See sec. 6662(a) and (b)(1).  "Negligence" is defined in section 6662(c) as "any failure to make a reasonable attempt to comply with the provisions of this title".  See also Freytag v.

Commissioner, 89 T.C. 849, 887 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).

Section 6664(c)(1) provides that the accuracy-related penalty shall not be imposed with respect to any portion of an underpayment if it is shown that a taxpayer acted in good faith and that there was reasonable cause for the underpayment. The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Petitioners bear the burden of proving facts showing good faith and reasonable cause. See Rule 142(a).

In the notice of deficiency, respondent determined that petitioners had omitted commission income of $28,000 from their 1993 return. Petitioners conceded this adjustment prior to trial but introduced no evidence at trial to explain the omission.[13] As to the underpayment attributable to this adjustment, therefore, petitioners have failed to prove that they acted with reasonable cause and in good faith as required by section 6664. The accuracy-related penalty as it relates to this adjustment is sustained.

---

[13]Although petitioners attempted to provide in their brief an explanation for their failure to report the commission income, they failed to introduce evidence to that effect at trial. Petitioners' failure to adduce evidence at trial on this issue cannot be remedied on brief. See Rule 143(b); Evans v. Commissioner, 48 T.C. 704, 709 (1967), affd. per curiam 413 F.2d 1047 (9th Cir. 1969).

We reach a different conclusion, however, with respect to the adjustments made pursuant to section 183.  As we view the record in this case, petitioners made a reasonable attempt to comply with the applicable revenue laws.  Our determination regarding petitioners' profit motivation was not easy. Petitioners presented facts in support of their position that their primary objective in conducting their horse activity was to make a profit, and their arguments with respect to this highly fact-intensive issue were reasonable and not frivolous.  See Engdahl v. Commissioner, 72 T.C. 659 (1979); Johnston v. Commissioner, T.C. Memo. 1997-475; Phillips v. Commissioner, T.C. Memo. 1997-128.  Although we do not agree with petitioners' arguments in the final analysis, petitioners have persuaded us that their position regarding their horse activity was taken in good faith and that they believed their return position was in accordance with applicable law.  This conclusion is supported by petitioners' certified public accountant, who prepared the returns for the years at issue.  He testified that petitioners' returns were prepared and filed in good faith and in accordance with his understanding of the then-applicable revenue laws.  We hold that the accuracy-related penalty does not apply to respondent's section 183 adjustments.  We have carefully considered the remaining arguments of both parties for results contrary to those expressed herein, and to the extent not

discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155.</u>