ATTORNEYS FOR PETITIONER:
**JAMES K. GILDAY**
GILDAY & ASSOCIATES, P.C.
Indianapolis, IN

**JAIME L. TURLEY PERZ**
ATTORNEY AT LAW
Valparaiso, IN

ATTORNEYS FOR RESPONDENT:
**CURTIS T. HILL, JR.**
ATTORNEY GENERAL OF INDIANA
**WINSTON LIN**
DEPUTY ATTORNEY GENERAL
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

FILED
Dec 29 2017, 1:48 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| | |
|---|---|
| NICK POPOVICH, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Cause No. 49T10-1010-TA-00053 |
| | ) |
| INDIANA DEPARTMENT OF STATE | ) |
| REVENUE, | ) |
| | ) |
| Respondent. | ) |

ON APPEAL FROM A FINAL DETERMINATION OF
THE INDIANA DEPARTMENT OF STATE REVENUE

**FOR PUBLICATION**
**December 29, 2017**

WENTWORTH, J.

Nick Popovich appeals the Indiana Department of State Revenue's Proposed Assessments of adjusted gross income tax (AGIT) for the 2003 and 2004 tax years. The Court, having previously determined that the Department's 2003 Proposed Assessment was void, see Popovich v. Indiana Dep't of State Revenue (Popovich VII), 52 N.E.3d 73, 77-78 (Ind. Tax Ct. 2016), now addresses the final issue in this case: whether Popovich was a professional gambler eligible for certain gambling-related deductions from his

Indiana adjusted gross income for the 2004 tax year. The Court finds that Popovich was not eligible for those deductions because he was not a professional gambler in 2004.

## FACTS[1] AND PROCEDURAL HISTORY

Popovich, a resident of Indiana, started playing blackjack at the age of 19. (See Trial Tr. at 10, 93-94.) Over the years, he continued to gamble with family and friends recreationally and on special occasions. (See Trial Tr. at 28-29, 93-94; Stipulated Facts & Exhibits ("Stip."), Confd'l Ex. 22 at 42-45.) Popovich married Patricia Sage-Popovich in the late 1980s; the couple subsequently moved into a home in Valparaiso, Indiana.[2] (See Stip., Confd'l Ex. 22 at 14; Trial Tr. at 10-11.)

In 1994, Patricia began to operate Sage-Popovich, Inc. ("SPI"), a corporation that provided a variety of aviation-related services, including airplane detailing, liquidations, and repossessions, from the couple's Valparaiso residence. (See Stip., Confd'l Ex. 22 at 15-30, Ex. 28; Trial Tr. at 12-13, 26-27.) In contrast, Popovich was engaged in a "transactional business" both before and after that period, which typically involved short-term independent contractor work or other abbreviated entrepreneurial endeavors. (See Trial Tr. at 13-25.) (See also Trial Tr. at 26 (stating "from 1987 to 2006 I never had a W-2, I was always one deal to another").) For example, Popovich once worked as a commercial pilot for about 6 months, he repossessed airplanes intermittently, he started a company that moved a steel mill to Australia during a 1½-year period, he was affiliated

---

[1] The parties have filed a stipulation of facts and the Court incorporates the stipulation and accompanying exhibits by this reference. (See Stipulated Facts & Exhibits ("Stip").) Some of the exhibits contain confidential information; therefore, the Court will provide only that information necessary for the reader to understand its disposition of the issues presented. See generally Ind. Administrative Rule 9.

[2] Several years later, after their attempts at reconciliation failed, the couple divorced. (See Trial Tr. at 11, 57-58.)

with a company that manufactured automatic weapons, and he established a charter boat business that "never quite got afloat." (See Trial Tr. at 15-25; Stip., Confd'l Ex. 22 at 33.) In fact, Popovich spent a week in a Haitian prison during the 1986 coup of Jean-Claude "Baby Doc" Duvalier after his attempt to repossess a plane on behalf of Huntington National Bank failed. (See Trial Tr. at 21-22.)

While watching the poker tour on television in late 2001, Popovich began to think about "trying his hand" at a new profession, namely becoming a professional blackjack player. (See Trial Tr. at 29.) After discussing the requirements for becoming a professional gambler with various casino employees, an attorney, and the IRS, Popovich determined that he needed to maintain detailed records of his gambling activities. (See Trial Tr. at 29-30, 84.) In addition, Popovich "mapped out" a business plan "in his head," purchased computer software to practice blackjack at home, and learned new gambling techniques, such as card counting and certain progressive betting strategies, by reading blackjack-specific books and blogs. (See Trial Tr. at 30-31; Pet'r Trial Ex. 1.)

By January of 2002, Popovich was ready to put his business plan into action. (See Trial Tr. at 34-37; Resp't Trial Ex. 1.) Because Popovich did not have a personal checking account of his own, Patricia used her personal checking account to establish a line of credit[3] for Popovich at the Horseshoe Hammond casino. (See Trial Tr. at 52-53; Stip., Confd'l Ex. 22 at 46-47, 92.) Popovich then put most of his newly learned gambling techniques into practice at Horseshoe Hammond on 40 separate occasions in 2002. (See Resp't Trial Ex. 1; Trial Tr. at 34-38 (explaining that he did not use the technique of card counting because he believed it was disfavored in Indiana and illegal in other states).)

---

[3] Popovich's initial line of credit at Horseshoe Hammond was $50,000; it increased to $850,000 by the end of the 2004 tax year. (Trial Tr. at 52.)

3

Popovich kept track of his gambling activities on excel spreadsheets, recording the specific casinos, the dates, the playing times, the "buy in" amounts,[4] and his wins and losses. (See Resp't Trial Ex. 1.)

After losing just over $200,000 during his trial run in 2002, Popovich reevaluated his gambling strategies and determined that he must, among other things, leave the table when the cards turned against him, take bigger breaks between losses to review his gameplay, and make fewer hunch bets (i.e., bets based entirely on feelings rather than on empirical data or "tried and true" methods). (See Resp't Trial Ex. 1; Trial Tr. at 35, 39, 103-06, 117, 129-30.) Popovich implemented the new strategies in 2003 and continued to track his gambling activities on excel spreadsheets for a total of 69 days at casinos in both Indiana and Nevada, but his losses soared to over $450,000. (See Stip., Ex. 11 at 1103-04, 1107.)

In 2004, however, Popovich's luck changed; his net winnings totaled $44,200 from gambling primarily at the Indiana Horseshoe Hammond casino over a 10½ month period. (See, e.g., Trial Tr. at 44; Stip., Ex. 12 at 1109.) During that year, Popovich also gambled at Harrah's East Chicago and Harrah's New Albany; in Louisiana at Harrah's New Orleans; and in Nevada at Caesars Palace, Caesars Tahoe, and Harrah's Tahoe. (See Stip., Ex. 12.) Popovich continued using excel spreadsheets to track his gambling activities albeit in a slightly different manner. (Compare Stip., Ex. 11 (2003 gambling

---

[4] Popovich described a "buy in" as follows:

> it's what they track that you buy into the table with. . . . [E]very time somebody goes to buy[] chips they have to call somebody over to verify [that] either the cash is on the table or the marker [is on the table], so that's your buy-in, and they track how much you've put on the table.

(Trial Tr. at 60-61.)

records) with Ex. 12 (2004 gambling records).)    Specifically, Popovich prepared a "Gaming Record" that documented his daily gambling activities by indicating the name of the casino at which he gambled, the date, the total time he was in the casino, the combined value of the markers,[5] and the games and tables at which he played.  (See Trial Tr. at 72-73, 84, 121-23; Stip., Ex. 12 at 1105-06.)    Popovich also prepared a "Win/Loss Record" that summarized the daily amounts of his winnings and losses by documenting the name of the casino at which he gambled, the date, the actual time spent gambling, and the combined value of markers.[6]  (See Trial Tr. at 73-74, 121-23, 126-27; Stip., Ex. 12 at 1109.)  (See also Trial Tr. at 82-85 (providing that Popovich did not make an entry on the Win/Loss Record when he broke even).)

In addition, Popovich retained certain casino-generated records, such as the casino Markers and Redemption Vouchers, to substantiate his self-prepared records. (See Trial Tr. at 70-72, 75-76, 99-102; Stip., Confd'l Ex. 14.)  The Markers included the

---

[5]  A marker is a check payable to a casino that gave Popovich access to, and documented each of his draws on, his lines of credit.  (See Trial Tr. at 53-59; Stip., Confd'l Ex. 14 at 578, 917.) Popovich described the process of obtaining a marker as follows:

> I would call the floor person over and tell them I'd like a marker for [$]200,000.  They would then call the credit department, see how much I had left on my line [of credit], they would print [the marker], bring it to the table, I would sign it, the pit boss would sign it, the dealer would sign it, they'd count out the chips[,] and we would exchange that.

(Trial Tr. at 67.)  Popovich then had 28-days to redeem the marker before the casino cashed it; once redeemed, the casino returned the marker to Popovich, and he placed it in his files for subsequent use in preparing his gambling records.  (See Trial Tr. at 53-54, 58-59, 67-69.)

[6]  During trial, Popovich could not definitively recall which, if any, of his self-prepared gambling records included his travel and break times.  (See Trial Tr. at 122-24).  For purposes of this case, therefore, the Court finds that Popovich's Gaming Record includes only the total amount of time expended in the casino and his Win/Loss Record includes only the total time expended in actual gameplay.  In other words, the Court assumes that neither record incorporates Popovich's travel or break times.

5

casino name, the time, the date, the distinct "check number," the precise games ("BJ" or "FW"),[7] and the tables where Popovich had gambled. (See, e.g., Stip., Confd'l Ex. 14 at 623, 917.) The Redemption Vouchers indicated when and how Popovich redeemed the Markers by providing the redemption date, referencing the Markers' distinct check numbers, and indicating whether Popovich redeemed a Marker by chip, cash, check, or wire transfer. (See Trial Tr. at 69; Stip., Confd'l Ex. 14 at 582, 606, 640, 769.) Popovich also obtained Trip History Reports from Horseshoe Hammond and Harrah's East Chicago at year's end that provided, among other things, estimates of the Markers' daily value, the time expended gambling, and the amounts won or lost. (See Trial Tr. at 62-66; see also, e.g., Stip., Ex. 9[8] at 135.) Popovich, however, stated that he did not use the Trip History Reports in preparing the Gaming Record or the Win/Loss Record because he thought they were unreliable given their use of estimates. (See, e.g., Trial Tr. at 62-66.)

In May of 2004, Popovich established his own personal checking account that he used to conduct his gambling activities. (See Trial Tr. at 56-57; Stip., Confd'l Ex. 15 at 996-1023.) Up to that point, he had used Patricia's checking account to conduct his gambling activities. (See Trial Tr. at 53-54; Stip., Confd'l Ex. 22 at 57-59, Confd'l Ex. 16.) In September of 2004, Popovich and Patricia established a joint checking account for Popovich's gambling activities. (See Trial Tr. at 57-58; Stip., Confd'l Ex. 22 at 59, Confd'l Ex. 15 at 1024-1093.) Popovich also made several loans to Patricia, payable on demand, for both her personal and professional use in 2003 and 2004. (See Stip., Confd'l Ex. 22

---

[7] The Court assumes that "BJ" stands for blackjack despite the lack of explanation on this point and, while it is unclear what specific game "FW" describes, the Court assumes it does not represent blackjack.

[8] Stipulated Exhibits 9 and 10 contain copies of the same 2004 Trip History Reports. (Compare Stip., Ex. 9 at 136-153 with Ex. 10 at 1172-1175, 1195-1201.)

at 75-77; Trial Tr. at 56, 85.)  While the loans were not memorialized by promissory notes, the couple did keep a "sloppy record" of them by handwriting the check numbers, the amounts loaned and repaid, and the relevant dates on a sheet of paper that they kept in Patricia's safety deposit box.[9]  (See Stip., Confd'l Ex. 22 at 71-79; Trial Tr. at 56, 85, 87-89, 115-16.)  The couple also included a line item named the "Popovich Gaming Account" on SPI's general ledger to document the amount of the demand loans and any repayments.  (See Trial Tr. at 138, 176-77.)  In mid-October 2004, Popovich's line of credit at the Horseshoe Hammond casino was suspended, and shortly thereafter, he stopped gambling entirely and moved onto another "deal."  (See Trial Tr. at 59-60, 90-91.)

In August of 2005, Popovich filed his 2004 federal and state income tax returns separately from Patricia.  (See Stip. ¶ 1, Confd'l Exs. 25-26.)  Popovich attached a Schedule C, Profit or Loss From Business, to his federal return, stating that he was a professional gambler.  (Stip., Confd'l Ex. 25 at 966.)  After deducting his gambling losses of $6,442,000 from his gambling winnings of $6,846,200 on the Schedule C, Popovich reported a gambling profit of $44,200 for the 2004 tax year.  (Stip., Confd'l Ex. 25 at 966.)  Popovich, however, carried forward a net operating loss from his 2003 gambling activities that reduced his 2004 federal adjusted gross income to a negative $411,031.  (Stip., Confd'l Ex. 25 at 964.)  Popovich then used his federal adjusted gross income as the starting point for calculating his 2004 Indiana AGIT liability as required by Indiana Code § 6-3-1-3.5(a), ultimately reporting his 2004 Indiana AGIT liability as zero.  (Compare Stip., Confd'l Ex. 25 at 964 with Confd'l Ex. 26 at 989-90.)  See also IND. CODE § 6-3-1-

---

[9]  By the time of trial, however, the sheet of paper could not be located.  (Trial Tr. at 89.)

3.5(a) (2004) (amended 2005) (defining adjusted gross income under IRC § 62 as the starting place for calculating an individual's Indiana adjusted gross income).

Approximately two years later, the Department audited Popovich and determined that he was not a professional gambler during the 2004 tax year. (See Stip. ¶ 2, Confd'l Ex. 20.) Accordingly, the Department disallowed his deduction of gambling losses from gambling winnings, recalculated his Indiana adjusted gross income, and determined that he owed additional AGIT for the 2004 tax year. (See, e.g., Stip., Confd'l Ex. 1 at 1218.) Consequently, on January 28, 2008, the Department issued its 2004 Proposed Assessment that imposed nearly $300,000 in AGIT, interest, and penalties. (See Stip. ¶ 3, Confd'l Ex. 3.) On March 12, 2008, Popovich protested the Department's 2004 Proposed Assessment, but he conceded that the 2003 net operating loss should not have been used to offset his 2004 gambling income. (Stip. ¶¶ 4, 8, Confd'l Ex. 5.) On August 3, 2010, the Department issued a Letter of Findings denying the remainder of Popovich's protest. (Stip. ¶ 5, Ex. 6.)

On October 4, 2010, Popovich initiated this original tax appeal. After resolving several interim matters,[10] Popovich's appeal proceeded to trial on December 7, 2016. The Court heard oral argument on March 23, 2017. Additional facts will be supplied as necessary.

---

[10] See generally Popovich v. Indiana Dep't of State Revenue (Popovich I), 7 N.E.3d 406 (Ind. Tax Ct. 2014); Popovich v. Indiana Dep't of State Revenue (Popovich II), 7 N.E.3d 419 (Ind. Tax Ct. 2014); Popovich v. Indiana Dep't of State Revenue (Popovich III), 13 N.E.3d 954, (Ind. Tax Ct. 2014); Popovich v. Indiana Dep't of State Revenue (Popovich IV), 17 N.E.3d 405 (Ind. Tax Ct. 2014); Popovich v. Indiana Dep't of State Revenue (Popovich V), 50 N.E.3d 407 (Ind. Tax Ct. 2016); Popovich v. Indiana Dep't of State Revenue (Popovich VI), 50 N.E.3d 415 (Ind. Tax Ct. 2016) (collectively, regarding a variety of discovery related issues); Popovich v. Indiana Dep't of State Revenue (Popovich VII), 52 N.E.3d 73 (Ind. Tax Ct. 2016) (regarding the Department's motion for summary judgment).

**STANDARD OF REVIEW**

The Court reviews the final determinations of the Department de novo. IND. CODE § 6-8.1-5-1(i) (2017). Accordingly, the Court is not bound by the evidence or the issues presented at the administrative level. Horseshoe Hammond, LLC v. Indiana Dep't of State Revenue, 865 N.E.2d 725, 727 (Ind. Tax Ct. 2007), review denied.

**LAW**

As mentioned, Indiana Code § 6-3-1-3.5(a) defines adjusted gross income under IRC § 62 as the starting place for calculating an individual's Indiana adjusted gross income. I.C. § 6-3-1-3.5(a). IRC § 62 states that for individuals, the term "adjusted gross income" means gross income minus, among other things, the type of expense deductions at issue here: above-the-line deductions related to a taxpayer's trade or business. See I.R.C. §§ 62, 162, 183 (2004).

While the question whether a taxpayer is engaged in the trade or business of professional gambling is one of first impression in Indiana, other jurisdictions have analyzed similar issues by applying the specific facts in those cases to the two-part test set forth in Commissioner of Internal Revenue v. Groetzinger, 480 U.S. 23 (1987) and certain Treasury Regulation factors. See, e.g., Moore v. C.I.R., 102 T.C.M. (CCH) 74, 2011 WL 2929168, at *2-3 (T.C. 2011); McKeever v. C.I.R., 80 T.C.M. (CCH) 358, 2000 WL 1297710, at *8-19 (T.C. 2000); Free-Pacheco v. U.S., 117 Fed. Cl. 228, 262-91 (Fed. Cl. 2014); Treas. Reg. § 1.183-2(a)-(b) (2004). The Court finds these federal authorities instructive and their reasoning applicable to this matter because they interpret the Internal Revenue Code provisions that Article 3 of Indiana's tax code incorporates by reference. See I.C. § 6-3-1-3.5(a); see also F.A. Wilhelm Constr. Co. v. Indiana Dep't of State

9

Revenue, 586 N.E.2d 953, 955 (Ind. Tax Ct. 1992) (providing that the legislature's reference to specific provisions of the Internal Revenue Code indicates its intent that Indiana's AGIT laws be interpreted in harmony with them). Accordingly, the Court will apply the U.S. Supreme Court's two-part test that requires a taxpayer claiming to be engaged in the business of professional gambling to demonstrate that he is "involved in the activity with continuity and regularity <u>and</u> that [his] primary purpose for engaging in the activity . . . [is] for income or profit." <u>C.I.R. v. Groetzinger</u>, 480 U.S. 23, 35 (1987) (emphasis added). Also, the Court finds instructive the federal Treasury Regulations that set forth a non-exhaustive list of nine factors to assist in determining whether a taxpayer is engaged in an activity for income or profit:

> (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation.

<u>See</u> Treas. Reg. § 1.183-2(a)-(b).

## ANALYSIS

### I. CONTINUITY AND REGULARITY

To determine whether a taxpayer's gambling activity exhibits the requisite continuity and regularity, a reviewing court must examine the specific facts in the case. <u>Groetzinger</u>, 480 U.S. at 36. <u>See</u> <u>also, e.g.</u>, <u>Free-Pacheco</u>, 117 Fed. Cl. at 263 (providing that "<u>Groetzinger</u> does not define what constitutes continuous and regular activity, other than to indicate that a 'sporadic activity, a hobby, or an amusement diversion does not

10

qualify'" (citation omitted)).  Courts generally have found, however, that a taxpayer's gambling activity is continuous and regular when the taxpayer gambles on a full-time basis[11] and has no other source of employment or livelihood.  See, e.g., Groetzinger, 480 U.S. at 35; Bathalter v. C.I.R., 54 T.C.M. (CCH) 902, 1987 WL 48826 (T.C. 1987).

**Gambling Time**

Groetzinger instructs that a taxpayer's gambling activity is continuous and regular when the taxpayer gambles on a full-time basis.  See Groetzinger, 480 U.S. at 35. Popovich contends that his gambling was continuous and regular because even though he did not gamble for 40 hours a week, a typical full-time work schedule, he spent sufficient time to be considered a full-time gambler.  (See Pet'r Post-Trial Br. ("Pet'r Br.") at 28-31; Pet'r Post-Trial Reply Br. ("Pet'r Reply Br.") at 21-23.)  Popovich presented evidence that shows:  1) he gambled a total of 60 days in 2004 (more than 1½ days per week annualized); 2) his gambling sessions lasted 5-6 hours each (totaling about 1,000 hours annualized); and 3) he spent about 10 hours a week studying blackjack.  (See Pet'r Br. at 4, 11-12, 28-31 and Pet'r Reply Br. at 21-23 (citing, e.g., Stip., Ex. 12 at 1105-06, Confd'l Ex. 22 at 71-72, 94-95; Trial Tr. at 27, 33, 85-86, 177-78).)  And, Popovich supports his position by referring to three federal cases interpreting the continuity and regularity requirement.  (See Pet'r Br. at 29-31 (citing Libutti v. C.I.R., 71 T.C.M. (CCH) 2343, 1996 WL 98762 (T.C. 1996); Storey v. C.I.R., 103 T.C.M. (CCH) 1631, 2012 WL 1409273 (T.C. 2012); Miller v. C.I.R., 76 T.C.M. 1174, 1998 WL 906689 (T.C. 1998), aff'd 208 F.3d 214 (6th Cir. 2000)).)

---

[11] The parties dispute whether the continuity and regularity requirement mandates that gambling full-time means at least 40 hours per week.  (Compare Pet'r Post-Trial Br. ("Pet'r Br.") at 30-31 with Resp't Post-Trial Br. ("Resp't Br.") at 10-11 and Oral Arg. Tr. at 38-39.)  The Court, however, does not need to resolve this dispute to resolve this matter.

During trial, Popovich presented his Gaming Record and his Win/Loss Record to show that he gambled for a total of 60 days in 2004 and that each of his gambling sessions lasted about 5-6 hours. Popovich stated that he prepared these records on the very day, or the day after, he gambled at a casino. (See Trial Tr. at 70-72.) Popovich claimed that these self-prepared records were complete and accurate not just because they were contemporaneous, but also because they were consistent with the casino-prepared Markers and Redemption Vouchers. (See, e.g., Trial Tr. at 75-76.)

Popovich's Gaming Record shows that he gambled for a total of 59 days in 2004, while his Win/Loss Record shows that he gambled 60 days that year. (See Stip., Ex. 12 at 1105-06 (providing that Popovich gambled at two different casinos on each of March 24, September 28, and October 11 resulting in 62 separate entries for 2004), 1109.) This inconsistency by itself might be overlooked if it were the only inconsistency between Popovich's self-prepared records, but it is not. For example, his Win/Loss Record indicates that he gambled on January 15, April 29, August 17, and September 27, but his Gaming Record does not contain a single entry for any of those dates. (Compare Stip., Ex. 12 at 1109 with 1105-06.) Moreover, his Gaming Record indicates that he spent a total of 323.3 hours in casinos during 2004, but his Win/Loss Record indicates that he spent a total of 356.29 hours gambling. (Compare Stip., Ex. 12 at 1105-06 with 1109.) These are not just simple inconsistencies, they also defy logical expectations because Popovich described his Gaming Record as his total time in a casino, not just the time he was actually gambling; so, the time recorded on his Gaming Record should always be equal to, if not more than, that reported on his more limited Win/Loss Record. Plus, some of the columns in Popovich's Gaming Record contain handwritten time entries or are

12

blank, (see Stip., Ex. 12 at 1105-06), suggesting the record is incomplete, possibly inaccurate, and not contemporaneously prepared.

The internal inconsistencies in Popovich's self-prepared records are made worse when comparing them to the casino-generated records. As stated above, Popovich's Win/Loss Record shows that he gambled on January 15 and April 29, but no Markers are in evidence for January 15 or April 29. Harmonizing these records suggests the illogical conclusion that although he was present at Horseshoe Hammond casino on those dates, he did not gamble, take out a single marker, or win or lose any money. (See Stip., Ex. 9 at 143, 151, Ex. 12 at 1109, Confd'l Ex. 14 at 577-894; Trial Tr. at 68-70 (stating that Popovich kept all his markers).)

Moreover, there are inconsistencies between Popovich's testimony and the casino-generated Trip History Reports. Popovich explained that he did not use the Trip History Reports to prepare his own records because they were inherently unreliable. (See, e.g., Trial Tr. 63-64.) Nonetheless, the time entries on his Win/Loss Record are identical to those on the Trip History Reports for Horseshoe Hammond. (Compare Stip., Ex. 12 at 1109 with Ex. 9 at 136-53.) For example, his Win/Loss Record and the Trip History Reports each exactly provide that Popovich gambled on April 9 for "4:56," April 10 for "4:34," May 6 for "3:54," July 23 for "8:25," and September 27 for "2:47." (Compare Stip., Ex. 12 at 1109 with Ex. 9 at 136, 139, 142, 146-47.) This suggests that Popovich may have used the Trip History Reports in preparing his own records. Accordingly, the evidence regarding Popovich's time spent gambling generally lacks the consistency to be considered credible or reliable.

13

**Supporting Case Law**

Popovich offered three federal authorities – the Libutti case, involving a craps player; the Storey case, involving an attorney/film-producer; and the Miller case, involving a freelance writer – to show that gambling for 60 days for 5 to 6 hours each day along with 10 hours of weekly study in 2004 was sufficient to satisfy the Groetzinger continuity and regularity requirement.  (See Pet'r Br. at 28-31.)  Popovich relied on the Libutti case, claiming the IRS conceded the taxpayer, who played craps for a total of 75 days in one year and 70 in another, was a professional gambler.  (See Pet'r Br. at 29-30 (citing Libutti, 1996 WL 98762, at *1).)  The issue in Libutti, however, was not whether the taxpayer was a professional gambler for purposes of deducting business expenses under IRC § 162, but rather how much of his gambling losses could be deducted as itemized deductions under IRC § 165.  See Libutti, 1996 WL 98762, at *1, 5.  Consequently, Libutti is not authoritative because the taxpayer's status as a professional gambler was never at issue.

Popovich also cites Storey, explaining that the taxpayer satisfied the continuity and regularity requirement regarding her film production business even though she operated the business primarily in the evenings and on weekends while also engaged as a partner in her full-time law practice during the day.  (See Pet'r Br. at 30-31 (citing Storey, 2012 WL 1409273, at *7).)  The taxpayer in Storey "credibly testified about the many evenings and weekends spent on film production, and her work product demonstrate[d] time-consuming care and attention to detail."  Storey, 2012 WL 1409283, at *7 (emphasis added).  The facts here are strikingly dissimilar because Popovich's records lack attention to detail and the credibility of his evidence is questionable, rendering Storey inapplicable.

Finally, Popovich relies on Miller where the taxpayer met the continuity and

14

regularity requirement for freelance writing having written 27 articles in one year and 32 in another. (See Pet'r Br. at 31 (citing Miller, 1998 WL 906689, at *3).) Popovich has not explained, however, how the number of articles written or other facts in Miller relate, either factually or temporally, to his gambling activities. The Court will not make Popovich's argument for him. Accordingly, Miller does not lend support to Popovich's position either.

### Source of Livelihood

Groetzinger further instructs that gambling activity may be continuous and regular when the taxpayer has no other source of employment or livelihood. See Groetzinger, 480 U.S. 35. See also Bathalter, 1987 WL 48826. Both Popovich and Patricia have averred that Popovich's sole source of livelihood in 2004 was professional gambling. Popovich stated that in 2004 he was not engaged in his former transactional business; he was not an employee of his wife's company, SPI; and he did not receive remuneration for providing leads and other consulting services to SPI. (See, e.g., Trial Tr. 27-28, 86-87.) Patricia also stated that Popovich did not perform any services for SPI as either an employee or independent contractor until 2006. (See Stip., Confd'l Ex. 22 at 30-33, 50-51, 84-86, 91-95.) Moreover, Popovich explained that payments he received from SPI in 2004 were repayments of the demand loans he had made to SPI, not compensation for the performance of personal services. (See Trial Tr. at 56, 85, 87-89, 115; Stip., Confd'l Ex. 19, Confd'l Ex. 22 at 71-79.)

Popovich stated that he occasionally performed work for SPI as an independent contractor in the 1990s. (See Trial Tr. at 95.) A February 2002 article, however,[12]

---

[12] It has been suggested that the article was published in 2007. (See Trial Tr. 163-67.) The first page of the article, however, establishes that it was published on February 18, 2002, and that the Department obtained the article via the internet on April 20, 2007. (Stip., Confd'l Ex. 1 at 1228.)

explained his relationship with SPI more fully:

> Nick Popovich will tell you about the time he was jailed in Haiti after bribing an airport operator with $10,000 in cold cash to let him fly a Boeing 707-720 off the tarmac. . . . Meet the repo man, big-airplane version. Mr. Popovich runs a 38-employee firm that helps creditors track their collateral and, if necessary, snatch it away from deadbeat operators. . . . At Sage-Popovich Inc., which Mr. Popovich operates with his wife, Patricia Sage-Popovich, out of their Valparaiso, Ind., country home, revenues have climbed by a compounded 20% to 22% since the early, '90s, they say. . . . ["]We repo'd some 52 aircraft last year alone, and more than a few of the owners are not happy,["] he says.

(Stip., Confd'l Ex. 1 at 1228-29 (emphasis added).) This article describes Popovich's role in SPI in 2002 as far more significant than either he or his former wife have disclosed.

Furthermore, wire transfers of large amounts of money flowed in and out of Popovich's checking accounts during 2004 from unexplained sources. (See, e.g., Stip., Confd'l Ex. 15 at 996-1036.) Popovich claimed that the incoming wire transfers attributable to SPI were merely repaying the demand loans he had previously made, but no objective evidence was presented that related the amounts he received to the SPI demand loan amounts. These types of monetary transactions beg for substantiation; without relating the payments to their sources, neither Popovich's nor Patricia's statements are persuasive and his independence from SPI in 2004 is questionable.

Having weighed the credibility and reliability of the evidence regarding Popovich's time spent gambling and the source of his livelihood during 2004, the Court is unconvinced that Popovich's gambling was regular and continuous. At best, the evidence in this case shows that Popovich gambled no more than five days per month, which, based on this fact alone, suggests that his gambling was sporadic, not continuous and regular. (See Stip., Ex. 12 at 1109 (providing that there were only two months (i.e.,

16

January and April) when the total number of days gambled exceeded 10).)

## II. PROFIT MOTIVE

In order for Popovich to be considered to be in the business of professional gambling, he must demonstrate that he gambled both with continuity and regularity and with the primary purpose of making income or profit. See Groetzinger, 480 U.S. at 35. Having found the evidence is inadequate to support Popovich's claim that he gambled with the continuity and regularity necessary to be considered a professional, the Court need not inquire into his profit motive, but chooses to do so here to examine all the facts in this case of first impression in Indiana.

As previously mentioned, the Treasury Regulations provide a list of nine factors to assist in determining whether a taxpayer is engaged in an activity to make a profit. See Treas. Reg. § 1.183-2(b). The factors must be examined and weighed considering all the facts and circumstances, on a case-by-case basis because no single factor or specific group of factors is dispositive; consequently, all nine of the enumerated factors need not be examined in every case. See id.; Popovich VII, 52 N.E.3d at 79. In this case, the parties have stipulated, and the Court agrees, that factors 4 and 5 do not apply. (See Stip. ¶ 10.) Accordingly, the Court turns to the parties' arguments on the remaining seven factors.

**Factor 1: Manner in which the taxpayer carries on the activity**

When a taxpayer carries on an activity in a businesslike manner, it may indicate that he is engaged in that activity for profit. See Treas. Reg. § 1.183-2(b)(1). To determine whether an activity is conducted in a businesslike manner, the Court may look at whether the taxpayer:  a) maintained complete and accurate books and records; b)

17

conducted the activity in a manner substantially similar to comparable profitable activities; and c) changed his operating methods, adopted new techniques, or abandoned unprofitable methods in a manner consistent with an intent to improve profitability. See id.; McKeever, 2000 WL 1297710, at *9.

Popovich claims he kept accurate, contemporaneous gambling records, that demonstrate that he gambled in a businesslike manner with the intent to make a profit. (See Pet'r Br. at 15-17.) As the Court just noted, however, numerous inconsistencies, anomalies, and discrepancies in Popovich's gambling records raise doubts about their reliability and call into question the credibility of Popovich's own testimony concerning his recordkeeping.[13] Many other examples of inconsistencies in his records further diminish the probative value of Popovich's claim that he gambled in a businesslike manner even further. (Compare, e.g., Stip., Confd'l Ex. 14 at 931, 939, 941, 947-48 with Ex. 12 at 1105-06 (showing Popovich retained markers from Harrah's New Orleans for January 22, Caesars Las Vegas for April 30, Harrah's Reno for September 16 and 17, and Harrah's Tahoe for September 17, but his Gaming Record does not indicate that he gambled at any of those casinos on those dates), Stip., Confd'l Ex. 14 at 931, 939, 941 with Ex. 12 at 1109 (showing Popovich's Win/Loss Record also fails to indicate that he gambled at Caesars Las Vegas on April 30, Harrah's Reno on September 16 and 17, and Harrah's

---

[13]  Popovich asserted that during the summary judgment process, he addressed all of the discrepancies in his records and "explained away each discrepancy . . . by demonstrating that [his] gaming records were correct[.]" (Trial Tr. at 76-77.)  The Court does not address these purported summary judgment explanations, however, because they were neither offered nor admitted into evidence during trial.

18

New Orleans on September 17).)[14]  Individually, these inconsistencies may seem inconsequential, but their cumulative effect is not indicative of conducting gambling activities in a businesslike manner.

Popovich additionally contends his prudent financial decisions, including establishing his own checking accounts, using lines of credit and certain reimbursements to fund his gambling, and accepting complimentary items from casinos that reduced his business expenditures (e.g., airfare, lodging, and meals), reflect his intent to earn income and make a profit by playing blackjack.  (See Pet'r Br. at 17-18; Trial Tr. at 43-44, 48, 52-57, 120-21; Stip., Confd'l Ex. 16.)[15]  Popovich, however, did not initially establish a separate checking account to conduct his gambling business, comingling his money with his wife's account.  Furthermore, he did not present reliable evidence, as noted above, to

---

[14]  There are also several unexplained inconsistencies regarding the combined marker entries. For example, the Gaming Record's marker entries correspond to the Horseshoe Hammond Markers and the Win/Loss Record's marker entries correspond to those in the Horseshoe Hammond Trip History Reports, but the Gaming Record marker entries for Horseshoe Hammond do not correspond to those in the Win/Loss Record. (See Stip., Ex. 9 at 136-53, Ex. 12, Confd'l Ex. 14 at 686-93, 703, 732-35, 891-94.)  This discrepancy appears to have resulted from Popovich including the value of all markers for the "FW" game on his Gaming Record, but not on his Win/Loss Record. (Compare, e.g., Stip., Confd'l Ex. 14 at 594-602, 606-13, 617-29, 631, 676-83, 694-95, 748-60 with Ex. 12.)  Without any explanation otherwise, Popovich's exclusion of the value of the FW game markers from his Win/Loss Record is troubling because it suggests that he may not have reported all of his income derived from gambling.  See 33A Am. Jur. 2d Federal Taxation ¶ 13260 (explaining that income derived from gambling, lotteries, sweepstakes, and card playing must be included in gross income, even if the income is exempt from withholding).  If Popovich sought to confine his trade or business to blackjack and exclude his recreational gambling activities (e.g., slot machine winnings or FW games), he should have reported the income derived from them on Form 1040, Line 21 (other income) rather than excluding it altogether.  See id.  (See also Trial Tr. at 71-72, 84-85, 126-27; Stip., Confd'l Ex. 14 at 900, Confd'l Ex. 25 at 966-67, Ex. 12 at 1109 (establishing that the gross profit figure on Popovich's Schedule C was derived from the Win/Loss Record that excluded his slot machine winnings and the value of the FW markers).)

[15]  In fact, Popovich stated that he was "pretty irate" when a casino secretly gave his former wife a $10,000 necklace. (See Trial Tr. at 43.)  Popovich also explained that he often rolled markers, i.e., paid off old markers with new markers, to extend his redemption period by another 28 days. (See Trial Tr. at 54, 116.)

explain the origin of certain substantial deposits that could dispel the appearance of comingling. And, although there is evidence that he funded his gambling in part by using lines of credit and certain reimbursements and that he accepted complimentary casino items that reduced his own costs, he did not present evidence to show how these activities indicated that he was engaged in gambling primarily as a business to make a profit rather than as a recreational hobby. Thus, the evidence is unpersuasive that Popovich's primary intent was to earn income and make a profit.

Finally, Popovich points to his overall conduct while playing blackjack as evidence of his profit motive. (See Pet'r Br. at 18-20.) For instance, Popovich testified that he established certain procedures to reduce his risk of loss and to increase profits, such as gambling alone at private tables, playing as many as three hands of blackjack simultaneously, requesting "courtesy shuffles," avoiding time-consuming blackjack tournaments that offered minimal financial returns, and avoiding alcohol while gambling. (See Trial Tr. at 39-45, 48-50.) Once again, however, Popovich has failed to show how this conduct relates to a primary motive of making a profit rather than primarily seeking entertainment. Therefore, the Court does not find that Popovich's record-keeping, financial practices, or risk-avoidance techniques indicate that he was engaged in gambling as his profession to earn income and make a profit. Accordingly, Factor 1 weighs in favor of the Department.

**Factor 2**: **The expertise of the taxpayer or his advisors**

The fact that a taxpayer develops his own expertise regarding an activity by either extensively studying its accepted business, economic, and scientific practices or consulting with experts, may indicate that he engaged in that activity for profit. See Treas.

20

Reg. § 1.183-2(b)(2); <u>Hastings v. C.I.R.</u>, 97 T.C.M. (CCH) 1355, 2009 WL 814227, at *4 (T.C. 2009).  When a taxpayer does not carry on the activity in accordance with those learned practices, however, a lack of a profit intent may be indicated absent evidence to the contrary.  <u>See</u> Treas. Reg. § 1.183-2(b)(2).

Popovich claims that Factor 2 weighs in his favor because the evidence established that even though he played blackjack for about 20 years, he consulted with knowledgeable casino employees, read several gambling books, participated in internet gambling blogs, and tried out new gambling strategies before pursuing gambling as his profession.  (<u>See</u> Pet'r Br. at 20-21; Oral Arg. Tr. at 16-17.)  The Department counters, however, that even though Popovich sought advice from casino employees, "there is no indication that the[ casino] employees had any special expertise in <u>playing</u> blackjack." (Resp't Br. at 19.)  Moreover, the Department contends that according to case law, Popovich devoted too little time to studying/researching the game to be considered a professional looking for a profit.  (<u>See</u> Resp't Br. at 18-19 (citing, e.g., <u>Groetzinger</u>, 480 U.S. at 24 (professional gambler studied dog racing materials 60 to 80 hours a week); <u>Bathalter</u>, 1987 WL 48826 (professional gambler studied horses 5-6 hours a day).)

Popovich's 20-year history of playing blackjack demonstrates a certain familiarity with the game, but the evidence confirms that he also consulted with casino employees, speaking with "dealers, hosts, floor people, [and] pit bosses" about gambling as a profession in general and the game of blackjack specifically.  (Trial Tr. at 30, 33.)  The Department's allegation that those individuals did not possess "special expertise in <u>playing</u> blackjack" is unavailing because it lacks evidentiary support.  <u>See, e.g., Knox Cnty. Prop. Tax Assessment Bd. of Appeals v. Grandview Care, Inc.</u>, 826 N.E.2d 177,

21

184-85 (Ind. Tax Ct. 2005) (providing that when allegations are unsupported by factual evidence they remain mere allegations). Moreover, the Department did not relate the factual similarities or differences of dog races and horse races, the subjects of cited authorities, with blackjack to show that the amount of study and research for dog and horse races should be the same for blackjack gambling.

Finally, the Department asserts that Popovich lacked a profit motive because he "knew of ways to improve his chances of winning, such as avoiding hunch betting and utilizing his knowledge of card counting, but he did not take advantage of these improvements." (Resp't Br. at 19-20; Oral Arg. Tr. at 47-48.) Popovich admitted knowing that card counting was a technique used by some blackjack players, but he stated that his deliberate avoidance of the technique actually shows that he had a profit motive because the practice is highly disfavored and could have led to his permanent ejection from casinos. (See Pet'r Reply Br. at 15; Oral Arg. Tr. at 17.) See also generally Donovan v. Grand Victoria Casino & Resort, L.P., 934 N.E.2d 1111 (Ind. 2010); Slade v. Caesars Entm't Corp., 373 P.3d 74 (Nev. 2016) (both upholding casinos' exclusion of card counters). Thus, Popovich's decision to forgo using the card counting technique does not convince the Court that he lacked a profit motive. Similarly, without evidence regarding the frequency of Popovich's hunch bets, the fact that he did this is insufficient to persuade the Court that he lacked a profit motive. Accordingly, the Court finds the weight of the evidence related to Factor 2 favors Popovich.

**Factor 3**: **The time and effort expended by the taxpayer in carrying on the activity**

Treasury Regulation § 1.183-2 provides that "[t]he fact that [a] taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity

22

does not have substantial personal or recreational aspects, may indicate an intention to derive a profit." Treas. Reg. § 1.183-2(b)(3). The Regulation further instructs that "[a] taxpayer's withdrawal from another occupation to devote most of his energies to the activity may also be evidence that the activity is engaged in for profit." Id.

Popovich contends that Factor 3 is treated as a "proxy" for the continuity and regularity requirement. (See Pet'r Br. at 14; Oral Arg. Tr. at 17.) Accordingly, Popovich has primarily restated his continuity and regularity arguments to establish that Factor 3 weighs in his favor. (Compare Pet'r Br. at 21-23 with 29-31.) Popovich, however, has also explained that the "concentrated psychic energy" he expended while gambling exceeded that of a recreational gambler because he simultaneously played three hands at a private table for about 378 hours[16] and from a "psychic energy standpoint," if you "extrapolate that out[,] being that he's one person playing three hands at a time, that equates to 9,534 hours for a casual gambler." (See Oral Arg. Tr. at 18.)

The Court has already determined that Popovich did not establish that he gambled with the requisite continuity and regularity and, finds his "concentrated psychic energy" argument unpersuasive. Accordingly, Factor 3 weighs in favor of the Department.

**Factor 4: The expectation that assets used in the activity may appreciate in value**

The parties have agreed, and the Court accepts, that Factor 4 is not applicable.

**Factor 5: Success of the taxpayer in carrying on other similar/dissimilar activities**

The parties also agree, and the Court accepts, that Factor 5 does not apply.

**Factor 6: The taxpayer's history of income or losses with respect to the activity**

The fact that a taxpayer continues to incur losses beyond the period that is

---

[16] The Win/Loss Record, however, provides that Popovich only gambled for 356.29 hours in 2004. (Stip., Ex. 12 at 1109.)

23

customarily necessary to bring the operation to profitable status, absent an explanation that the lengthier loss period was due to customary business risks or reverses, may indicate that the activity is not being engaged in for profit. See Treas. Reg. § 1.183-2(b)(6). Although the parties have argued that the inferences to be drawn from the evidence support their respective opposing positions on Factor 6, neither has provided any evidence or cited authority concerning what is the customary period for earning a profit when pursing the profession of gambling in general or blackjack specifically.[17] (See Pet'r Br. at 23-24; Resp't Br. at 21-22; Oral Arg. Tr. at 21-25.) The Court, therefore, finds that Factor 6 cannot be applied in this case.

### Factor 7: The amount of occasional profits, if any, which are earned

Facts regarding "[t]he amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity," may be useful in determining whether an activity was engaged in for profit. Treas. Reg. § 1.183-2(b)(7). For instance, "[a]n occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit." Id. In contrast, "substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small." Id. Furthermore, "[a]n opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated." Id.

---

[17] Popovich's argument is primarily based on a federal small tax case. (See, e.g., Pet'r Br. at 23-24 (citing Myers v. C.I.R., T.C. Summ. Op. 2007-194, 2007 WL 4117442 (T.C. 2007)).) Nonetheless, that case has no precedential value even in the federal tax arenas.

24

The parties' positions on Factor 7 are derived from their comparisons of certain case law to the facts in this case. Specifically, Popovich has relied on Betts v. Commissioner of Internal Revenue, 100 T.C.M. (CCH) 67, 2010 WL 2990300, at *13 (T.C. 2010) for his contention that winning on 29 of the 60 days he gambled in 2004 and having his winnings exceed $50,000 on 26 of the 29 days indicates the appropriate profit motive. (See, e.g., Pet'r Br. at 24-26 (citing, e.g., Stip., Ex. 12 at 1109); Pet'r Reply Br. at 17-18.) Betts concerned a taxpayer's participation in the "highly speculative venture" of purchasing, developing, and reselling show horses. See Betts v. C.I.R., 100 T.C.M. (CCH) 67, 2010 WL 2990300, at *4, *13 (T.C. 2010). In that case, the court found that even though the taxpayer's horse activities failed to generate profits over a 4 year period, Factor 7 still favored the taxpayer given the speculative nature of horse activities in general and her initial belief that she could "hit the 'jackpot'" by selling her horse. See id. at *2, *13.

The Department, on the other hand, relies on Emerson v. Commissioner of Internal Revenue, 79 T.C.M. (CCH) 1921, 2000 WL 371582, at *5 (T.C. 2000) as support for its position that Popovich's occasional wins were "nullified by his massive losses" and, thus, his expectation of profit was unreasonable and he lacked a profit motive. (See Resp't Br. at 22-23.) Emerson involved a taxpayer's participation in another "highly speculative venture:" automobile drag racing. See Emerson v. C.I.R., 79 T.C.M. (CCH) 1921, 2000 WL 371582, at *2, *5 (T.C. 2000). Ultimately, the taxpayer in that case failed to convince the court that he had "an 'opportunity to earn a substantial ultimate profit'" from automobile drag racing because his winnings were "miniscule in relation to both the losses he incurred and his total investment in the activity" and he did not have a sponsor

25

to finance the costly activity.  Id. at *2, *5.

Here, the facts show that Popovich believed he could earn a profit by gambling given both his luck and the fact that professional poker players earned substantial profits. (See Trial Tr. at 29.)  Popovich used lines of credit to finance his gambling, he accepted complimentary items from casinos that reduced his costs and, although he stopped gambling shortly after one of his lines of credit was suspended, he managed to earn a small profit of $44,200 that was reported on his 2004 federal income tax return after wagering over $6 million that year.  Moreover, nearly half of the time that Popovich played blackjack, his gambling activities generated winnings rather than losses.  Indeed, by May of 2004 his aggregate winnings had surpassed $1,000,000.   (See Stip., Ex. 12 at 1109.) Because these facts indicate that Popovich is more like the taxpayer in Betts and less like the taxpayer in Emerson, the Court finds that Factor 7 favors Popovich.

**Factor 8:  The financial status of the taxpayer**

The fact that a taxpayer has "[s]ubstantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved."  Treas. Reg. § 1.183-2(b)(8).  Indeed, the legislative history of IRC § 183 "indicates a particular concern about wealthy individuals attempting to generate paper losses for the purpose of sheltering unrelated income."  Taras v. C.I.R., 74 T.C.M. (CCH) 1388, 1997 WL 777273, at *9 (T.C. 1997) (citation omitted), aff'd 138 F.3d 627 (3rd Cir. 1999).

Popovich maintains that Factor 8 weighs heavily in his favor because he did not engage in any "transactional projects" in 2004, and, thus, he did not earn any other

26

taxable income or have any taxable income to shelter that year. (See Pet'r Br. at 26; Pet'r Reply Br. at 18.) (See also Trial Tr. at 120 (stating that he had no income in 2001 because he was a "house husband"), 51 (claiming that his net worth at the beginning of 2003 was $300,000 because he only owned the Valparaiso residence); 59-60 (stating that he "ran into a couple of deals" in late 2004 after he stopped gambling and became a paid consultant for SPI in 2005).) Nevertheless, the Court previously explained that it could not determine whether Popovich worked at SPI during 2004 given the inconsistencies in the evidence. Moreover, the Court finds it peculiar that an individual who owned a $300,000 residence, historically had established more than one business, repossessed planes, and served as a commercial pilot over the course of several years did not have a personal checking account until 2004. Nonetheless, because there is no definitive evidence that Popovich worked at SPI during the 2004 tax year, the Court finds Factor 8 to be neutral.

### Factor 9: Elements of personal pleasure or recreation

Finally, Treasury Regulation § 1.183-2 provides that "[t]he presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved." Treas. Reg. § 1.183-2(b)(9). Nonetheless, a business should not "'be turned into a hobby merely because the owner finds it pleasurable; suffering has never been made a prerequisite to deductibility.'" Betts, 2010 WL 2990300, at *14 (citation omitted).

Popovich contends that his "actions and decisions surrounding his professional gambling demonstrate that [he] did not view or treat gambling as a pleasurable activity." (Pet'r Br. at 27.) (See also Trial Tr. at 49-50 (professing that "he neither perceive[d]

27

gambling as a pleasurable activity, nor . . . derive[d] pleasure from it").) Indeed, Popovich explains that he routinely declined the casinos' non-monetary incentives, spent at least 10 hours a week studying and practicing blackjack, gambled alone, and did not consume alcohol while gambling. (Pet'r Br. at 27-28.) The Department, on the other hand, contends that Popovich's 20-year history of gambling; Patricia's testimony that he had always enjoyed blackjack, including during the time he claimed to be a professional; and the limited number of days that he played blackjack indicate that he gambled recreationally, not professionally. (See Resp't Br. at 26-27 (citing Stip., Ex 22 at 101).) (See also Stip., Ex. 22 at 45 (indicating that Popovich has never been a "big drinker").) Having considered the parties' arguments and the relevant facts, the Court finds that Factor 9 favors the Department.

## CONCLUSION

In challenging the Department's 2004 Proposed Assessment, Popovich bore the burden of proving it was wrong. Popovich, therefore, was required to present a prima facie case that he not only gambled with continuity and regularity, but also with the intent to make a profit. See Lafayette Square Amoco, Inc. v. Indiana Dep't of State Revenue, 867 NE.2d 289, 292 (Ind. Tax Ct. 2007) (stating "[a] prima facie case is one in which the evidence is 'sufficient to establish a given fact and which if not contradicted will remain sufficient'") (emphasis added and citation omitted). Given the inconsistency of the trial evidence and weighing of the Treasury Regulation factors, the Court concludes that Popovich did not make a prima facie case as to either requirement. Accordingly, the Department's 2004 Proposed Assessment must stand.

28